**RECORD NOS. 13-2122(L), 13-2124**

*In The*

# United States Court Of Appeals

### For The Fourth Circuit

## CHARLES F. SPOSATO,

*Plaintiff – Appellant/Cross-Appellee,*

v.

## FIRST MARINER BANK OF MARYLAND,

*Defendant – Appellee/Cross-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE**

————————

**BRIEF OF APPELLEE/CROSS-APPELLANT**

————————

**Michael A. Brown
Michael E. Blumenfeld
John E. McCann, Jr.
Derek P. Roussillon
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, MD 21202
(410) 727-6464**

*Counsel for Appellee/Cross-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2122 L__    Caption: _Charles Sposato v. First Mariner Bank_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_First Mariner Bank_____
(name of party/amicus)

_____

who is _appellee and cross-appellant_, makes the following disclosure:
          (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:
      First Mariner Bancorp

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                             ☑ YES ☐ NO
      If yes, identify all such owners:
      First Mariner Bancorp

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Derek P. Roussillon_____    Date:  September 26, 2013____

Counsel for:  First Mariner Bank_____

## CERTIFICATE OF SERVICE
****************************

I certify that on  September 26, 2013  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Derek P. Roussillon                                      September 26, 2013____
(Signature)                                                          (date)

07/19/2012                                    - 2 -
SCC

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF JURISDICTION......................................................... 1

STATEMENT OF ISSUES ...................................................................... 1

STATEMENT OF THE CASE.................................................................. 2

STATEMENT OF FACTS ........................................................................ 4

    A.    Sposato's Participation in the Plan........................................... 4

    B.    First Mariner's Judgments Against Sposato .......................... 6

    C.    First Mariner's Efforts to Enforce its Judgments.................. 6

SUMMARY OF THE ARGUMENT ........................................................ 7

ARGUMENT ............................................................................................ 9

    I.    Standard of Review .................................................................. 9

    II.    The District Court Properly Held that Plan Benefits are Subject to Garnishment by First Mariner......................................... 10

        A.    ERISA's Anti-Alienation Requirement Does Not Apply to Top Hat Plans........................................................ 11

        B.    Sposato's Argument Renders the Statutory Exemption from Anti-Alienation a Nullity ................................. 13

        C.    Sposato's Expansive Application of ERISA Preemption is Contrary to Law................................................... 16

i

D.    Sposato's Speculative Concerns of Adverse Tax Consequences Do Not Justify Preemption of Maryland's Garnishment Law ...................................................24

E.    The IRC Does Not Give Sposato a Private Right of Action Against First Mariner ...................................................28

F.    The Plan Anti-Alienation Provision is Not Enforceable Against First Mariner ...................................................32

III.  The District Court Erred in Limiting First Mariner's Garnishments Pursuant to the CCPA ...................................................34

A.    Annual Payments Under the Plan Are Not the Type of "Periodic Payments" Protected by the CCPA...........................36

B.    Sposato's Top Hat Plan is Not the Type of "Pension or Retirement Program" Protected by the CCPA........................42

CONCLUSION ...................................................44

REQUEST FOR ORAL ARGUMENT ...................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

SUPPLEMENTAL STATUTORY ADDENDUM

ii

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>CASES</u>

AFLAC Inc. v. Diaz-Verson,
   No. 4-11-CV-81 (CDL),
   2012 WL 1903904 (M.D. Ga. May 25, 2012)......................................<u>passim</u>

Alessi v. Raybestos-Manhattan, Inc.,
   451 U.S. 504 (1981)...........................................................................20

Bird v. United States,
   187 U.S. 118 (1902)...................................................................14, 21

Bond v. Marriott Int'l, Inc.,
   -- F. Supp.2d --, No. 10-cv-1256-RWT,
   2013 WL 4829263 (D. Md. Aug. 9, 2013)....................................11

Brown & Williamson Tobacco Corp. v. Food & Drug Admin.,
   153 F.3d 155 (4th Cir. 1998) ..........................................35, 36, 44

Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.,
   519 U.S. 316 (1997)...................................................................17, 22

Carson v. Local 1588 Int'l Longshoremen's Assoc.,
   769 F. Supp. 141 (S.D.N.Y. 1991) ......................................10, 11, 12

Cowan v. Keystone Employee Profit Sharing Fund,
   586 F.2d 888 (1st Cir. 1978)..............................................................29

Donovan v. Dillingham,
   688 F.2d 1367 (11th Cir. 1982) (*en banc*)...........................10, 22, 23

Egelhoff v. Egelhoff,
    532 U.S. 141 (2001)...................................................................17, 22, 23, 28

Gen. Motors Corp. v. Buha,
    623 F.2d 455 (6th Cir. 1980) .......................................................12

Goldstein v. Johnson & Johnson,
    251 F.3d 433 (3rd Cir. 2001) .......................................................11

Guidry v. Sheet Metal Worker Nat'l Pension Fund,
    493 U.S. 365 (1990)......................................................................20

Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,
    530 U.S. 238 (2000).......................................................................31

Holloman v. Mail-Well Corp.,
    443 F.3d 832 (11th Cir. 2006) ...............................................10, 11

Kennedy v. Plan Admin'r for DuPont Sav. & Inv. Plan,
    555 U.S. 285 (2009).......................................................................31

Kokoszka v. Belford,
    417 U.S. 642 (1974).......................................................................40

Loffredo v. Daimler AG,
    500 Fed. Appx. 491, 2012 WL 4351358 (6th Cir. 2012).............................23

Mackey v. Lanier Collection Agency & Serv. Inc.,
    486 U.S. 825 (1988).................................................................passim

Maynard v. Merrill Lynch & Co.,
    8:07-cv-1149-T-23MSS,
    2008 WL 4790670 (M.D. Fla. Oct. 28, 2008)................................................34

iv

Nachman Corp. v. Pension Benefit Guar. Corp.,
446 U.S. 359 (1980)......................................................................20

Nadar v. Blair,
549 F.3d 953 (4th Cir. 2008) ...................................................9, 10

Nationwide Mut. Ins. Co. v. Darden,
503 U.S. 318 (1992)......................................................................14

New York State Conf. of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co.,
514 U.S. 645 (1995)................................................................17, 37

Nolan v. Meyer,
520 F.2d 1276 (2d Cir. 1975), cert. denied,
423 U.S. 1034 (1975)....................................................................29

Raymond B. Yates, M.D. P.C. Profit Sharing Plan v. Hendon,
541 U.S. 1 (2004)....................................................................14, 15

Reklau v. Merchants Nat'l Corp.,
808 F.2d 628 (7th Cir. 1986) .......................................................29

Roberts v. Nicholas,
WDQ-04-2039, 2007 WL 5145353 (D. Md. Jan. 26, 2007) ...........6

Robinson v. Am. Honda Co., Inc.,
551 F.3d 218 (4th Cir. 2009) .........................................................9

Shaw v. Delta Air Lines, Inc.,
463 U.S. 85 (1983)........................................................................17

Tenneco Inc. v. First Va. Bank of Tidewater,
698 F.2d 688 (4th Cir. 1983) .......................................................12

v

Travelers Ins. Co. v. Fountain City Fed. Credit Union,
  889 F.2d 264 (11th Cir. 1989) (*per curiam*)...................................................12

U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,
  508 U.S. 439 (1993).........................................................................................36

United States v. A.P. Woodson Co.,
  198 F. Supp. 582 (D.D.C. 1961)..............................................................14, 21

United States v. Cooper,
  No. 02-40069-SAC, 2006 WL 3512936 (D. Kan. Nov. 1, 2006) ...........40, 41

United States v. DeCay,
  620 F.3d 534 (5th Cir. 2010) ......................................................................passim

United States v. Lee,
  659 F.3d 619 (7th Cir. 2011) ........................................................................41, 43

United States v. James,
  312 F. Supp. 2d 802 (E.D. Va. 2004) ...............................................................12

United States v. Tohono O'Odham Nation,
  131 S. Ct. 1723 (2011)...............................................................................14, 21

U.S. Airways v. McCutchen,
  133 S. Ct. 1537 (2013).......................................................................................31

Vermeulen v. Cent. States, Se. and Sw. Areas Pension Fund,
  490 F. Supp. 234 (M.D.N.C. 1980) ...................................................................29

Wiesner v. Romo Paper Prods. Corp.,
  514 F. Supp. 289 (E.D.N.Y. 1981) ...................................................................29

Witthohn v. Fed. Ins. Co.,
  164 Fed. Appx. 395 (4th Cir. 2006) ...................................................................6

In re Wheat,
    149 B.R. 1003 (S.D. Fla. 1992) ...................................................32

In re Witwer,
    148 B.R. 930 (C.D. Cal. 1992) ........................................28, 29, 30

**STATUTES**

15 U.S.C. § 1672 ...................................................................2, 37, 43

15 U.S.C. § 1672(a) .....................................................................35, 42

15 U.S.C. § 1672(a)(2) .........................................................................39

15 U.S.C. § 1672(b) .............................................................................35

15 U.S.C. § 1673 ...................................................................2, 38, 39

15 U.S.C. § 1673(a)(1) .........................................................................39

26 U.S.C. § 401(a) ...............................................................................29

26 U.S.C. § 409A ........................................................................passim

26 U.S.C. § 409A(a)(1) .......................................................................26

26 U.S.C. § 409A(a)(1)(A)(ii) .............................................................26

26 U.S.C. § 409A(a)(3) .........................................................................25

26 U.S.C. § 7805 .................................................................................24

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1332 ................................................................................................1

29 U.S.C. § 1002(8) .........................................................................................23

29 U.S.C. § 1051(2) ....................................................................................passim

29 U.S.C. § 1056(d)(1)........................................................................11, 12, 19

29 U.S.C. § 1132(a)(3) ...............................................................................16, 30

29 U.S.C. § 1144(a) ....................................................................................16, 17

Ga. Code Ann., § 18-4-20 .................................................................................43

Md. Code Ann. Com. Law § 15-601, *et seq.* ....................................................2

## REGULATIONS

29 CFR § 870.10 ...............................................................................................39

29 CFR § 870.10(c)...........................................................................................40

Rev. Proc. 92-65, § 3(01) (1992) .....................................................................24

Treas. Reg. § 1.401(a)-13(b)(1) .......................................................................29

Treas. Reg. § 1.409A-1(b)(1) ...........................................................................26

Treas. Reg. § 1.409A-3(f) ...........................................................................24, 25

Treas. Reg. § 1.409A-3(j) .................................................................................24

Treas. Reg. § 601.601(d)(2)(i)(b) .....................................................................24

## RULES

Fed. R. Civ. P. 12(b)(6)........................................................................9

Fed. R. Civ. P. 56(c)..........................................................................10

Md. R. 2-645 .................................................................................6, 22

Md. R. 2-645(a)..................................................................................26

## OTHER AUTHORITIES

Aspinwall & Goldstein, Taxation and Funding of Non-Qualified
    Deferred Compensation, A Complete Guide Design and Implementation,
    158-59 (2012) ...........................................................................27

Black's Law Dictionary, (9th ed. 2009).....................................36, 37, 41

H.R. Rep. No. 93-533, 93rd Cong., 2d Sess.,
    reprinted in 1974 U.S. Code Cong. & Ad. News 4639 ................................10

H.R. Rep. No. 1040, 90th Cong., 2d Sess. (1968),
    reprinted in 1968 U.S.C.C.A.N.1962 (1979)........................................35, 38

U.S. Dept. of Labor Advisory Op. 91-16A (Apr. 5, 1991)....................................27

## STATEMENT OF JURISDICTION

The cross-appeals before this Court are taken from the final judgment of the United States District Court for the District of Maryland (the "District Court"). Plaintiff-Appellant, Charles F. Sposato ("Sposato"), filed a complaint for a declaratory judgment that benefits due to him under Cecil Bank's Supplemental Executive Retirement Plan (the "Plan") are not subject to garnishment by Defendant-Appellee, First Mariner Bank ("First Mariner"). The District Court exercised subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1332, which grant federal question and diversity jurisdiction to district courts of the United States. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. These appeals arise from the final judgment of the District Court dated August 8, 2013, granting in part and denying in part First Mariner's Motion to Dismiss Plaintiff's Complaint or in the Alternative for Summary Judgment and Sposato's Cross-Motion for Summary Judgment. Sposato filed his Notice of Appeal on September 6, 2013. First Mariner filed its Notice of Cross-Appeal later that same day.

## STATEMENT OF ISSUES

1.     Whether the District Court correctly held that Sposato's retirement benefits under the Plan are subject to garnishment by First Mariner, a third-party judgment creditor.

2.     Whether the District Court erred in holding that annual payments made to Sposato under the Plan constitute "earnings" under the federal Consumer Credit Protection Act ("CCPA"), so as to limit First Mariner's garnishment to 25% of those payments.

## STATEMENT OF THE CASE

This action arises from Sposato's efforts to prevent First Mariner from executing on money judgments against him in excess of $5.3 million. Upon obtaining these judgments, First Mariner served writs of garnishment on Sposato's former employer, Cecil Bank. (JA 9).  In response, Cecil Bank identified Sposato's retirement benefits under the Plan as a debt it owes to Sposato. (JA 10).

Sposato filed this action seeking a declaratory judgment that annual payments due to him under the Plan are not subject to garnishment by operation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). (JA 6-12). Alternatively, Sposato argued that if subject to garnishment, 75% of each annual Plan payment is shielded from garnishment by operation of: (a) Maryland's Wage Garnishment Act, MD. CODE ANN. COM. LAW § 15-601, *et seq.* (the "MWGA") and (b) Sections 302 and 303 of the CCPA, 15 U.S.C. §§ 1672-1673. (JA 71-72, 141-44).

First Mariner moved to dismiss Plaintiff's Complaint or alternatively for summary judgment. (JA 31-46).  Sposato cross-moved for summary judgment.

2

(JA 47-74). By Order dated August 8, 2013, the District Court entered its final judgment, granting in part and denying in part First Mariner's Motion to Dismiss and Sposato's Cross-Motion for Summary Judgment. (JA 209). The reasons for and authorities supporting the final judgment are set forth in two Memorandum Opinions dated March 28, 2013 (JA 150-59) and August 8, 2013 (JA 202-08). In its March 28, 2013 Opinion, the District Court held that neither ERISA nor the Plan itself precludes garnishment of Sposato's Plan benefits by First Mariner, a third-party creditor. (JA 150-57). In its August 8, 2013 Opinion, the District Court declared that even though they are not protected "wages" under the MWGA (JA 205-07), annual payments under the Plan constitute "earnings" under the CCPA, which as a matter of federal law protects 75% of those funds from garnishment. (JA 207-08).

Sposato now appeals the District Court's ruling that Plan benefits are properly subject to garnishment. In his opening Brief,[1] Sposato does not contest and, therefore, concedes the District Court's ruling that his Plan benefits are property and not protected "wages" under the MWGA. Although First Mariner maintains that the District Court properly ruled that Plan benefits constitute property that is fully subject to garnishment under Maryland law, it now cross-

---

[1] Citations to Sposato's opening Brief shall appear herein as "Pl.'s Br."

3

appeals the District Court's ruling that the CCPA limits its garnishments to 25% of the net annual payments made to Sposato under the Plan.

## STATEMENT OF FACTS

The facts of this case as presented below are not genuinely disputed.

### A.    Sposato's Participation in the Plan

From 1999 to 2011, Sposato served as a director of Cecil Bank and, for part of that time, served as Chairman of the Board of Cecil Bank. (JA 7).  During his tenure, Cecil Bank established the Plan for the purpose of attracting high quality executives by providing participating executives with supplemental retirement benefits. (JA 7).  The Plan, commonly referred to as a "top hat" plan, "is intended to be an unfunded plan maintained primarily to provide deferred compensation benefits for a select group of 'management or highly compensated employees.'" (JA 24, ¶ 11.10); (JA 151).[2]  As an unfunded top hat plan within the meaning of ERISA, the Plan was intended "to be exempt from *Parts 2*, 3 and 4 of Title 1 of ERISA." (JA 24, ¶ 11.10) (emphasis added).

Through a Participation Agreement dated May 30, 2004, Sposato became a participant in, and beneficiary of, the Plan. (JA 50, ¶ 4).  The Plan, as amended and restated, provides its executive participants with deferred compensation in the form

---

[2]  Pursuant to paragraph 1.8 of the Plan, the persons eligible to participate are "the Chairman, Chief Executive Officer, President or Vice President of [Cecil] Bank, or such other management level employee, as may be designated … to be eligible to participate …"  (JA 16, ¶ 1.8).

of the retirement and death benefits set forth in articles 4 and 5 of the Plan. (JA 18-19).  As an unfunded plan, these benefits are to be paid "from the general funds of [Cecil] Bank," and the participants and beneficiaries are unsecured general creditors of Cecil Bank with no special or prior right to any of Cecil Bank's assets for payment of the benefits. (JA 22, ¶ 10.2).  Paragraph 10.1 of the Plan contains an anti-alienation provision which states:

> Nonassignability.  The benefits provided under the Plan may not be alienated, assigned, transferred, pledged or hypothecated by any person, at any time, or to any person whatsoever.  Those benefits shall be exempt from the claims of creditors or claimants of the Participant or Beneficiary and from all orders, decrees, levies, garnishment or executions **to the fullest extent allowed by law**.

(Id.) (emphasis added).

The Plan is to be construed in a manner consistent with section 409A of the Internal Revenue Code ("IRC") "to the maximum extent possible." (JA 25, ¶ 12.2). "[I]f such construction is not possible," however, the Plan shall be construed "as if such provision had never been included." (Id.)  Although the Plan is generally governed and construed in accordance with federal law, it expressly provides that: "If any issue should arise with respect to the Plan in a context where state law is not fully preempted by ERISA, the laws of the State of Maryland shall govern." (JA 24, ¶ 11.11)

On July 12, 2011 (the "Retirement Date"), Sposato resigned from his position at Cecil Bank. (JA 8).  Sposato then became eligible to receive retirement

benefits under the Plan in the form of lifetime, annual payments of $289,583 in January of each year ("Annual Payments"). (JA 146). The first Annual Payment was made in January 2012, as reflected in a Form W-2 Wage and Tax Statement that Cecil Bank provided to Sposato. (JA 146-48).

### B.    First Mariner's Judgments Against Sposato

Separate from his employment with Cecil Bank, Sposato invested in and guaranteed commercial loans made by First Mariner for the purposes of financing certain real estate projects. (JA 50, ¶ 7). When those loans fell into default, First Mariner filed three separate lawsuits against Sposato in the Circuit Court for Baltimore City resulting in money judgments against him in a total amount in excess of $5.3 million.[3]

### C.    First Mariner's Efforts to Enforce its Judgments

In an effort to enforce these judgments, First Mariner served writs of garnishment on Cecil Bank pursuant to Maryland garnishment law, Md. Rule 2-645. (JA 9-10; 151). In response to those writs, Cecil Bank identified Sposato's

---

[3] Although Sposato's Complaint and his Brief reference only two of these cases (JA 9); (Pl.'s Br. at 3-4), the District Court properly took judicial notice of all three cases that First Mariner brought against Sposato in the Circuit Court for Baltimore City, Maryland. (JA 151); see Witthohn v. Fed. Ins. Co., 164 Fed. Appx. 395, 397 (4th Cir. 2006) (In evaluating a motion to dismiss, "[a] district court may clearly take judicial notice of [state court] records"); Roberts v. Nicholas, WDQ-04-2039, 2007 WL 5145353, at *3 (D. Md. Jan. 26, 2007). Those three judgments, as amended, collectively amount to over $5.3 million owed to First Mariner Bank. See Civil Case Nos. 24-C-11-006016; 24-C-11-006087; 24 C-11-005988 (Cir. Ct. for Balt. City, Md.).

retirement benefits under the Plan as debt it owes to Sposato. (JA 10, 151). In an effort to shield his Plan benefits from garnishment by First Mariner, Sposato filed this declaratory judgment action. (JA 51, ¶ 4).

In his opening Brief, Sposato asserts, without record citation, that his Plan benefits are "his only source of income."[4] Nothing in the record supports this allegedly undisputed fact. In his Complaint, Sposato alleged that he "is dependent on receiving his retirement benefit distributions in order to pay for his living expenses." (JA 12, ¶ 32). Although this alleged fact was assumed to be true for purposes of First Mariner's Motion to Dismiss, Sposato neither alleged nor otherwise testified in his prior Affidavits (JA 49-51; 146-148) that the "supplemental" retirement benefits due to him under the Plan were the only retirement benefits he receives and relies upon or that he has no other source of income.[5]

## SUMMARY OF THE ARGUMENT

The District Court properly held that Plan benefits are subject to garnishment by First Mariner. Top hat plans are a form of deferred compensation provided to senior management and other high-level employees. Recognizing that

---

[4] (Pl.'s Br. at 4).

[5] Later in the Argument section of his Brief, Sposato baldly asserts that "the only protection keeping Sposato from being forced into bankruptcy by First Mariner is his right to receive his annual retirement benefits." (Pl.'s Br. at 26). Again, there is simply no record support for this factual assertion.

such high-level employees are in a strong bargaining position relative to their employers, top hat plans are expressly exempt from ERISA's anti-alienation requirement and, therefore, are subject to garnishment by third-party creditors. Consistent with ERISA, the Plan itself expressly acknowledges that it is exempt from ERISA's anti-alienation requirement and the protection against third-party creditors that the statute provides.

In his Brief, Sposato attempts to attain through his private contract with Cecil Bank the very protection against third-party creditors not afforded to him by statute. Based on an erroneously expansive notion of ERISA preemption that has been rejected by the United States Supreme Court, Sposato argues that the anti-alienation provision in his Plan with Cecil Bank preempts First Mariner's state law garnishment rights. Sposato's argument is wrong as a matter of law and public policy. Rather, as the District Court properly held, First Mariner's garnishment of the Annual Payments violates neither ERISA nor the Plan and does not necessarily lead to the adverse tax consequences about which he speculates. Moreover, even if adverse tax consequences do result from First Mariner's garnishments, such incidental effects do not grant Sposato a substantive right to enforce the anti-alienation provision in the Plan against third parties. Instead, as the District Court held, the Plan's anti-alienation provision is a contract between Cecil Bank and its employees that is not enforceable against third-party creditors, such as First Mariner.

Although the District Court properly held that Plan benefits constitute property that is fully subject to garnishment under Maryland law, it erred in its finding that the CCPA limits First Mariner's garnishments to 25% of the net Annual Payments made to Sposato under the Plan. Enacted to ensure continued means of subsistence for debtors and their families, the CCPA protects from garnishment 75% of a debtor's "earnings" as defined by the statute. Although "earnings" include, "periodic payments pursuant to a pension or retirement program," annual payments pursuant to a top hat plan, which are designed to provide deferred compensation to highly paid executives, are simply not the type of payments protected by the CCPA.

## ARGUMENT

### I.    Standard of Review.

This Court reviews *de novo* an order of dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Robinson v. Am. Honda Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). Although this Court will construe the factual allegations in the Complaint as true, the Court is not bound by the Complaint's legal conclusions. Id. Similarly, this Court reviews a district court's grant of summary judgment *de novo*, applying the same legal standard as the district court. Nadar v. Blair, 549 F.3d 953, 958 (4th Cir. 2008). A district court should only grant summary judgment when

9

there is no genuine dispute as to an issue of material fact, and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c)).

## II. The District Court Properly Held that Plan Benefits are Subject to Garnishment by First Mariner.

"Congress enacted ERISA to protect certain employees from abuses in the administration and investment of private retirement plans and employee welfare plans." Carson v. Local 1588 Int'l Longshoremen's Assoc., 769 F. Supp. 141, 143 (S.D.N.Y. 1991) (citing H.R. Rep. No. 93-533, 93rd Cong., 2d Sess., reprinted in 1974 U.S. CODE CONG. & AD. NEWS 4639). "In essence, ERISA establishes minimum standards for the vesting of benefits, funding of plans, overseeing fiduciary responsibilities, reporting to the government and making disclosures to participants." Id.; see also Donovan v. Dillingham, 688 F.2d 1367, 1370 (11th Cir. 1982) (en banc). However, "the ERISA framework does not include in its protection all retirement arrangements, nor do all provisions of the statute apply equally to each covered plan." Carson, 769 F. Supp. at 143.

One of the retirement plans exempted from many of ERISA's substantive provisions is a top hat plan. Holloman v. Mail-Well Corp., 443 F.3d 832, 837 (11th Cir. 2006). As defined by section 201(2) of ERISA, a top hat plan is a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). While generally subject to ERISA, top hat plans

10

are exempt from ERISA's participation, vesting, funding, and fiduciary liability provisions. Holloman, 443 F.3d at 837; see also Bond v. Marriott Int'l, Inc., -- F. Supp.2d --, No. 10-cv-1256-RWT, 2013 WL 4829263, at *2 (D. Md. Aug. 9, 2013). The rationale for having top hat plans exempt from certain substantive ERISA requirements is because "high-level employees are in a 'strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees.'" Holloman, 443 F.3d at 837 (quoting Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3rd Cir. 2001)).[6]

## A.   ERISA's Anti-Alienation Requirement Does Not Apply to Top Hat Plans.

One of the substantive requirements from which top hat plans are expressly exempt is the mandate in Part 2 of ERISA, section 206(d)(1) (29 U.S.C. § 1056(d)(1)), that requires the inclusion of an anti-alienation provision. 29 U.S.C. § 1051(2) (listing "unfunded" top hat plans as an exception to the coverage of Part 2); see also Carson, 769 F. Supp. at 144 (finding that ERISA's non-alienation rule does not apply to a top hat plan); AFLAC Inc. v. Diaz-Verson, No. 4-11-CV-81 (CDL), 2012 WL 1903904, at *5 (M.D. Ga. May 25, 2012) ("Top hat plans . . . are exempt from ERISA's anti-alienation provision.").  Under ERISA's anti-alienation

---

[6] See also Carson, 769 F. Supp. at 144 ("While Congress sought to give some protections to top hat plans, which apply to top management and other highly compensated employees, the comprehensive ERISA framework is aimed primarily at the rank and file employee.").

mandate, "each pension plan shall provide that benefits provided under a plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). Reflective of a statutory scheme designed to protect benefits under qualified plans from all forms of alienation, <u>Carson</u>, 769 F. Supp. at 144, this prohibition extends to voluntary and involuntary assignments, including garnishment. <u>Gen. Motors Corp. v. Buha,</u> 623 F.2d 455, 460 (6th Cir. 1980) (rejected on other grounds by <u>Emp'rs Res. Mgmt. Co., Inc. v. Shannon</u>, 65 F.3d 1126 (4th Cir. 1995)).[7]

Unlike qualified pension plans generally available to rank and file employees, unfunded top hat plans are not statutorily protected against alienation of benefits. In exempting top hat plans from the anti-alienation requirement, Congress recognized that high level employees participating in such plans do not require the same substantive protection against alienation as other types of ERISA plans. <u>See</u> <u>Carson</u>, 769 F. Supp. at 144. By operation of this statutory exemption, therefore, top hat plans are subject to garnishment, unless some other statutory exception applies. <u>AFLAC</u>, 2012 WL 1903904, at *5.[8]

---

[7] <u>See also</u>, <u>AFLAC</u>, 2012 WL 1903904, at *5 (citing <u>Travelers Ins. Co. v. Fountain City Fed. Credit Union</u>, 889 F.2d 264, 266 (11th Cir. 1989) (*per curiam*)); <u>Tenneco Inc. v. First Va. Bank of Tidewater</u>, 698 F.2d 688, 689 (4th Cir. 1983)).

[8] As Sposato acknowledges, no other statutory exceptions to the anti-alienation requirement apply in this case. (Pl.'s Br. at 7, n. 1) (citing <u>United States v. James</u>, 312 F. Supp. 2d 802, 805 (E.D. Va. 2004) (recognizing the Mandatory Victim Restitution Act of 1996 ("MVRA") as one such exception)).

**B.    Sposato's Argument Renders the Statutory Exemption from Anti-Alienation a Nullity.**

While conceding that the Plan at issue is exempt from the anti-alienation protections of section 206(d)(1),[9] Sposato would have this Court render the statutory exemption under section 201(2) a nullity. Relying on a strained interpretation of certain Treasury Regulations promulgated pursuant to the IRC, Sposato argues that the anti-alienation provision in the Plan itself (the "plan anti-alienation provision") is enforceable against third parties and, therefore, preempts Maryland state garnishment law.[10]   Citing to purported adverse tax consequences of First Mariner's garnishments, Sposato argues that if the plan anti-alienation provision is not given preemptive effect, then no "top hat plans in Maryland will be able to meet the requirements of the tax laws for deferred taxation of plan benefits, without which no employer would ever establish such a deferred compensation plan."[11]   Sposato even goes so far as to contend that if the plan anti-alienation provision is not enforceable against First Mariner, "the Plan is not considered 'unfunded' and therefore would not meet the definition of an ERISA top hat plan."[12]   By purportedly "harmonizing" the provisions of ERISA to certain tax

---

[9] (Pl.'s Br. at 7); (JA 153, n. 2).

[10] (Pl.'s Br. at 4-5).

[11] (Pl.'s Br. at 5).

[12] (Pl.'s Br. at 8, n. 2; at 10-11).

13

regulations, Sposato seeks to impose the requirement of non-alienation on all top hat plans, despite the fact that Congress specifically ***excluded*** top hat plans from that mandate.

Sposato's argument, however, would render the statutory exemption from anti-alienation afforded top hat plans nugatory in violation of cardinal principles of statutory construction.  See United States v. Tohono O'Odham Nation, 131 S. Ct. 1723, 1730 (2011) ("Courts should not render statutes nugatory through construction."); United States v. A.P. Woodson Co., 198 F. Supp. 582, 585 (D.D.C. 1961) ("[C]ourts should avoid a construction that would render a statute ineffective and nugatory.") (citing Bird v. United States, 187 U.S. 118, 124 (1902)).  Under Sposato's flawed construction, the statutory exemption under ERISA is antithetical to the very existence of a top hat plan as defined in section 201(2) (29 U.S.C. § 1051(2)). To adopt this construction would presume that Congress went out of its way to create an exemption which, by definition, could never apply.  Such a result would cause an "intolerable conflict" within ERISA itself, leading to the very sort of "absurd results" against which the Supreme Court has warned.  Raymond B. Yates, M.D. P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 18 (2004) (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992)).

On this point, Sposato's reliance on Hendon is misplaced. As Sposato points out, the United States Supreme Court has held that if there is any doubt about the proper interpretation of ERISA based on a lack of clarity in a provision, it is proper to "look at other provisions of [ERISA] for instruction." (Pl's Br. at 12) (citing Hendon, 541 U.S. at 12). Here, there is no lack of clarity in the statutory exemption afforded top hat plans under section 201(2) (29 U.S.C. § 1051(2)). Even if it is somehow deemed to be unclear, however, Sposato does not look internally within ERISA for instruction, as directed by the Supreme Court. Rather he looks beyond the statute to Treasury Regulations promulgated pursuant to the IRC. Although these regulations often can provide useful guidance in interpreting ERISA, they cannot be used to create an internal inconsistency within the ERISA statute itself, as Sposato does here.

In addressing this same argument below, the District Court properly rejected it as contrary to law and public policy. (JA 154-156). As he did in the District Court, Sposato argues that his Plan's anti-alienation provision provides the very protection against third-party commercial creditors to which he is not entitled under section 206(d)(1).[13] Purporting to derive this protection from "other provisions of ERISA,"[14] Sposato points to ERISA's general preemption provision

_____

[13] (Pl.'s Br. at 4-5).

[14] (Pl.'s Br. at 5).

in section 514(a) (29 U.S.C. § 1144(a)) and its civil enforcement provision in section 502(a)(3) (29 U.S.C. § 1132(a)(3)).[15]  Based on these provisions, Sposato argues that his plan anti-alienation provision must be construed consistently with section 409A of the IRC and its corresponding Treasury Regulations, which require inclusion in the Plan of an anti-alienation provision to secure the "favorable tax treatment" that makes his Plan "desirable."[16]  Sposato's argument, however, misapplies the operative IRC provision and ignores the fundamental purpose and effect of the IRC within the broader ERISA framework.

### C.    Sposato's Expansive Application of ERISA Preemption is Contrary to Law.

Sposato argues that, "[w]hat the plan says trumps competing considerations, whether they be state laws or the interests of third parties."[17]  Asserting that "ERISA preemption is broad and reaches all state laws that frustrate ERISA's purpose and objectives," Sposato maintains that federal law preempts First Mariner's garnishment of his Plan benefits.[18]  As the District Court recognized, however, Sposato's expansive application of ERISA preemption is overstated and is contrary to applicable Supreme Court precedent. (JA. 154-55).

---

[15]  (Pl.'s Br. at 6-7; 15).

[16] (Pl.'s Br. at 10-11, 13).

[17] (Pl.'s Br. at 9).

[18] (Pl.'s Br. at 14-15).

16

ERISA's general preemption provision in section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Finding the text of this provision to be "unhelpful" and citing "the frustrating difficulty of defining its key term,"[19] the Supreme Court has fleshed out the test for determining whether state laws "relate to" an ERISA plan in a series of decisions. Egelhoff v. Egelhoff, 532 U.S. 141, 147 (2001) (drawing from Travelers, supra, and Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983)). Under this test, ERISA preempts any state law that references ERISA plans or has a "connection with" an ERISA plan, including a connection that implicates an area of "core ERISA concern." Id. The Supreme Court, however, clarified that ERISA does not preempt state laws that have only an "incidental effect on ERISA plans." Id. at 148 (citing Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 330 (1997)); see also Travelers, 514 U.S. at 661-62 (finding indirect economic impact of state law on ERISA plans does not warrant preemption).

In applying this test, the Supreme Court has held that absent an express state law reference to ERISA plans, ERISA does not preempt state garnishment law. Mackey v. Lanier Collection Agency & Serv. Inc., 486 U.S. 825, 837-38 (1988). In Mackey, the respondent was a collection agency ("Lanier") that obtained money

---

[19] New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995) ("Travelers")

17

judgments against participants of a welfare benefit plan in a Georgia trial court. Id. at 827. In an effort to enforce the judgments, Lanier instituted an action to garnish the participants' plan benefits, which the trial court allowed. Id. at 827-28. In attempting to protect their plan benefits from garnishment, the beneficiaries argued that Georgia state garnishment law and procedure were preempted by ERISA. Id. at 830-31. In rejecting this argument, the Mackey court reasoned that it was never Congress' intention to preclude state law attachment of ERISA welfare plans. Id. at 838. Integral to the court's holding was the determination that ERISA's provisions and aspects of the statute's structure dictate that Congress did not intend to forbid the use of state law mechanisms of executing judgments against ERISA welfare plans, even when those mechanisms prevent plan participants from receiving their benefits. Id. at 831-32.

One indication of this intent is that there are several types of civil suits that can be brought against ERISA welfare benefit plans. Id. at 832. Section 502 of ERISA expressly permits civil enforcement actions to be brought by persons against ERISA plans for recovery of plan benefits or to enforce a participant's rights under a plan, and as such, clearly contemplates the enforcement of money judgments against benefit plans. Id. ERISA plans can also be sued for "run-of-the-mill" state law claims such as for unpaid rent, failure to pay creditors, or as the result of their tortious actions. Id. at 833. ERISA does not provide an enforcement

mechanism for collecting judgments won in these type of actions. <u>Id</u>. Thus, the Court held that "state-law methods for collecting money judgments must remain undisturbed by ERISA; otherwise there would be no way to enforce such a judgment against an ERISA plan." <u>Id.</u> at 834.

Importantly, the Court also rejected the beneficiaries' argument that section 514(a) prohibits ERISA welfare plans from complying with garnishments only where these orders affect whether benefits will be paid to a plan participant, as opposed to the plan's funds in general. <u>Id.</u> at 835. The Court explained:

> Where Congress intended in ERISA to preclude a particular method of state-law enforcement of judgments, or extend anti-alienation protection to a particular type of ERISA plan, it did so expressly in the statute. Specifically, ERISA § 206(d)(1) bars (with certain enumerated exceptions) the alienation or assignment of benefits provided for by ERISA pension plans. Congress did not enact any similar provision applicable to ERISA welfare benefit plans…

<u>Id.</u> at 836 (citing 29 U.S.C. § 1056(d)(1)). The court emphasized that, when Congress was adopting ERISA, it had before it a provision to bar the alienation or garnishment of ERISA plan benefits and chose to impose that limitation only with respect to certain ERISA plans and not ERISA welfare benefit plans. <u>Id.</u> at 837. "In a comprehensive regulatory scheme like ERISA, such omissions are significant ones." <u>Id.</u> "Congress' decision to remain silent concerning the attachment or garnishment of ERISA welfare plan benefits 'acknowledged and accepted the

practice, rather than prohibiting it.'" Id. at 837 (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504 (1981)).

By rejecting the argument that garnishment should be preempted to the extent that it affects whether benefits would be paid to a plan participant, the Supreme Court in Mackey specifically rejected Sposato's central policy argument. Sposato argues that the garnishments here should be preempted "to make sure that if a worker is promised a pension benefit upon retirement he will actually receive it." (Pl.'s Br. at 7) (citing Guidry v. Sheet Metal Worker Nat'l Pension Fund, 493 U.S. 365, 376-77 (1990)).  Far from supporting Sposato's position, the Court in Guidry simply followed Mackey by recognizing the enforceability of section 206(d)(1) in the context of qualified ERISA pension plans.  In Guidry, the Supreme Court held that section 206(d)(1) not only protects against garnishment, but against its close remedial cousin, a constructive trust.  Guidry, 493 U.S. at 371-72.  Nothing in Guidry speaks to the situation present here, where the top hat plan at issue is expressly exempt from the mandates of section 206(d)(1).[20]

---

[20] Similarly, Sposato's reliance on the pre-Mackey decision in Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359 (1980), is misplaced.  While generally addressing the intent of Congress to ensure that beneficiaries under qualified plans receive their benefits, id. at 375, Nachman did not address the issue of garnishments laid against an ERISA plan exempted from ERISA's anti-alienation protections.  On this issue, the Supreme Court's decision in Mackey is controlling precedent.

Sposato's further attempt to distinguish <u>Mackey</u> on the grounds that it involved an ERISA welfare plan, as opposed to a retirement plan, rings hollow.[21] The holding in <u>Mackey</u> applies with equal, if not more, force to the top hat plan at issue in this case. Although Congress exempted ERISA welfare plans from the anti-alienation requirement contained in section 206(d)(1) by omission, it expressly exempted top hat plans from that same statutory mandate. 29 U.S.C. § 1051(2). As made clear in <u>Mackey</u>, in a comprehensive statute like ERISA, Congress' exemption of top hat plans from ERISA's anti-alienation provision is significant and cannot be ignored. <u>Mackey</u>, 486 U.S. at 837. Sposato's argument that another provision of ERISA would impose the anti-alienation requirement on a top hat plan "would render § 206(d)(1) substantially redundant with § 514(a)," so as to make that provision "superfluous" in violation of cardinal principles of statutory construction. <u>Id.</u> at 837 (citations omitted). Conversely, such a reading would render the express statutory exemption to that same mandate applicable to top hat plans under section 201(2) nugatory in violation of those same principles. <u>See</u> <u>United States v. Tohono O'Odham Nation</u>, 131 S. Ct. at 1726; <u>A.P. Woodson Co.</u>, 198 F. Supp. at 585 (citing <u>Bird v. United States</u>, 187 U.S. at 124). This result flies in the face of controlling Supreme Court precedent.

---

[21] (Pl.'s Br. at 19-20).

21

Here, like the Georgia statute at issue in <u>Mackey</u>, Maryland's garnishment laws do not reference ERISA plans or treat them differently from any other property. (JA 155) (citing Md. R. 2-645).[22]  Maryland garnishment law does not interfere with the administration of the Plan, but merely provides a process by which a plan participant's creditor can access Plan benefits to which it has a lawful claim when benefits would otherwise be distributed to Sposato. (JA 155) (citing <u>Mackey</u>, 486 U.S. at 834, n. 10) (finding state garnishment law a procedural device to enforce a judgment, not substantive law creating rights and responsibilities)). Thus, Maryland's garnishment laws do not "relate to" the administration of an ERISA plan. <u>Id.</u>  To hold that ERISA generally preempts such a state procedural device in an area of traditional state regulation, notwithstanding an express statutory exemption to the contrary, "would do grave violence to [the] presumption that Congress intended nothing of the sort."  <u>See</u> <u>Dillingham</u>, 519 U.S. at 334 (holding that ERISA did not preempt California's prevailing wage law based on an alleged, but highly tenuous, connection to ERISA).

In this regard, Sposato's reliance on <u>Egelhoff v. Egelhoff</u>, 532 U.S. at 148, is misplaced.[23]  In <u>Egelhoff,</u> the Supreme Court found that ERISA preempted a Washington statute providing that the designation of a spouse as the beneficiary of

---

[22] In his opening Brief, Sposato does not contest the District Court's reading of Maryland's state garnishment law.

[23] (Pl.'s Br. at 9).

22

a non-probate asset is automatically revoked upon divorce. Id. at 152. The Washington statute included "employee benefit plan" and "retirement account" in its definition of "non-probate asset." Id. at 144. Additionally, the Washington statute, unlike Maryland's garnishment law, implicated an area of "core ERISA concern" because the statute "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status." Id. at 147. ERISA has specific provisions for designation of beneficiaries. Id. (citing 29 U.S.C. § 1002(8)). The Supreme Court was careful to note that preemption is impermissible if a law has only an "incidental effect on ERISA plans." Id. at 148 (citing Dillingham, 519 U.S. at 330).[24]

Here, nothing in Maryland's garnishment law references ERISA or implicates a "core ERISA concern." Even if (as Sposato speculates) Maryland garnishment laws result in adverse tax consequences to some Plan participants

---

[24] Sposato also overstates the significance of Loffredo v. Daimler AG, 500 Fed. Appx. 491, 2012 WL 4351358 (6th Cir. 2012), an unpublished and non-precedential slip opinion of the Sixth Circuit. In Loffredo, the court held that certain state law claims filed by plan participants were preempted by ERISA. Id. at 495-99. Unlike the instant matter, however, the state law causes of action at issue in Loffredo were preempted because they were essentially ERISA claims repackaged as state law claims and, therefore, duplicative of ERISA's civil enforcement remedy. See id. As demonstrated previously, the Maryland garnishment laws do not conflict, duplicate, or supplement any provision of an ERISA plan. See Mackey, 486 U.S. at 834, n. 10.

(discussed below), such consequences would only have an "incidental effect" on ERISA plans.

### D. Sposato's Speculative Concerns of Adverse Tax Consequences Do Not Justify Preemption of Maryland's Garnishment Law.

Notwithstanding the <u>Mackey</u> decision, Sposato argues that Maryland's garnishment law is preempted by operation of section 409A of the IRC (26 U.S.C. § 409A), its corresponding Treasury Regulations, sections 1.409A-3(f) and (j),[25] and related Revenue Procedures.[26]  Based on these provisions, Sposato contends that if First Mariner's garnishments are enforceable against the benefits due under a top hat plan, then "all participants in the Plan would be treated as having been paid in violation of IRC § 409A and be subject not just to current payment of taxes, but to substantial excise taxes."[27]  This argument not only misapplies the operative

---

[25]  Section 1.409A-3(f) of the Revenue Service Regulations is the Treasury Department's interpretation of section 409A.  The purpose of the Treasury Regulations is to enforce the IRC. <u>See</u> IRC § 7805, 26 U.S.C. § 7805 (the Regulations "prescribe all needful rules and regulations for enforcement" of the IRC).

[26] The Revenue Procedures (the "Procedures") are statements of procedure that do not affect the rights or duties of taxpayers or members of the public under the IRC. Treas. Reg. § 601.601(d)(2)(i)(b).  As the District Court noted, the Procedures "provide guidance solely on the factor to be present in cases where the IRS 'will ordinarily issue rulings regarding unfunded deferred compensation arrangements' and not about the substance of such rulings." (JA 155, n.4) (citing Rev. Proc. 92-65, § 3(01) (1992)).

[27] (Pl.'s Br. at 10-11).

IRC provision and related regulations to the facts of this case, but misconstrues the fundamental purpose and effect of the IRC within the broader ERISA framework.

To the extent possible, the Plan was designed to comply with the requirements of section 409A of the IRC. (JA 25, Plan ¶ 12.2). Section 409A governs non-qualified deferred compensation arrangements, including top hat plans. It provides that the deferred benefit payments under a top hat plan must remain deferred to the date provided in the plan for payment; that is, the benefit payments may not be accelerated. See 26 U.S.C. § 409A(a)(3) ("The requirements of this paragraph are met if the plan does not permit the acceleration of the time or schedule of any payment under the plan, except as provided by regulations by the Secretary."). The corresponding Treasury Regulations provide that if a plan participant's "right to deferred compensation is made subject to . . . garnishment by [his] creditors . . . the deferred compensation is treated as having been paid." Treas. Reg. § 1.409A-3(f). Based on these provisions, Sposato argues that regulatory treatment of deferred compensation subject to garnishment as "having been paid" constitutes acceleration.[28]

As the District Court noted (and ignored in Sposato's opening Brief), this argument fails because the Plan benefits are not accelerated. The garnishments attach to each annual benefit payment only at the time that the payment would

---

[28] (Pl.'s Br. at 10-11; 13) (see also JA 155, n. 4)

otherwise be payable under the Plan after deferral. (JA 155, n. 4).  The payment at that point is not *deferred* compensation subject to IRC section 409A.  See Treas. Reg. § 1.409A-1(b)(1) (providing that deferred compensation is compensation that "… is or may be payable … in a later taxable year.").  Thus, "because First Mariner seeks only to garnish Sposato's Plan benefits as they become due and payable . . . [the garnishment] does not require acceleration of plan payments or the garnishment of benefits before they are due." (JA 155, n. 4; 157) (citing Md. R. 2-645(a) (specifying which property can be garnished including "any debt owed to the judgment debtor, whether immediately payable or unmatured.")).

As further explained by the District Court,

> This decision does not mean that all top hat plans are invalidated or unable to comply with the relevant regulations.  Indeed, it is not even clear that Sposato will lose his tax-deferred status because his benefits will not be garnished until payable.  A former employee, who is a plan recipient cannot pledge plan benefit assets himself, and most benefits will not be subject to garnishment.  In fact, the IRC itself specifically states that any failure of a plan to comply with the relevant IRC provisions that would engender negative consequences 'shall only apply with respect to all compensation deferred under the plan for participants with respect to whom the failure relates.' 26 U.S.C. § 409A(a)(1)(A)(ii).  Significantly, this provision limits the number of plan participants who would be affected by the current decision to those whose plan benefits are subject to valid garnishment orders or other plan failures. See 26 U.S.C. § 409A(a)(1).

(JA 156, n. 5).

Although Sposato rests his entire appeal on the notion that protecting Plan benefits from garnishment is necessary to avoid purported adverse tax

consequences, he does not address in his opening Brief the District Court's rationale in ruling against him on that issue. Sposato cites no IRS ruling applying the pertinent regulations to hold that garnishment by a third-party creditor of plan payments as they become due constitutes an impermissible "acceleration," so as to deprive the entire Plan of its tax-deferred status.

Rather, Sposato's support for this proposition rests on an Advisory Opinion of the Department of Labor that arose in the context of a "rabbi trust" formed to collect assets for a top hat plan. (Pl.'s Br. at 8) (citing U.S. Dept. of Labor Advisory Op. 91-16A (Apr. 5, 1991)). Sposato's reliance on this Advisory Opinion is misplaced. The Opinion simply recognizes that the establishment of a rabbi trust for the accumulation of assets for a top hat plan will not cause that top hat plan to be other than "unfunded" for purposes of exemptions in Title I of ERISA. See Adv. Op. 91-16A at 2. The assets in the rabbi trust are subject to the claims of the employer's general creditors in the event of the employer's insolvency. Id. Nothing in that Opinion, however, suggests that the plan will be other than unfunded (and, therefore, not qualify as a top hat plan) where the plan benefits are subjected to garnishment as they become due and payable. Id.[29]

---

[29] Sposato also cites to a tax treatise, co-authored by his counsel. (Pl.'s Br. at 8, n. 3) (citing Aspinwall & Goldstein, Taxation and Funding of Non-Qualified Deferred Compensation, A Complete Guide Design and Implementation, 158-59 (2012)). Although the cited portion of this treatise explains the necessity of including an anti-alienation provision in a top hat plan to secure tax deferral under

27

In any event, such highly speculative adverse tax consequences cited by Sposato (if they exist at all) would at best have an "incidental effect" on the Plan. They would not implicate the type of "core ERISA concern" necessary to justify the type of broad statutory preemption that Sposato asks this Court to endorse. See Egelhoff, 532 U.S. at 147.

### E.      The IRC Does Not Give Sposato a Private Right of Action Against First Mariner.

Even if one were to accept Sposato's speculative assertion that the garnishments here violate section 409A of the IRC, he has no private right of action against First Mariner.  The requirements of section 409A merely set forth the criteria for a benefit plan to defer taxes on the benefits until such time as those benefits are paid to the participants or beneficiaries.   As Sposato concedes, however, "the IRC 'does not generally create a private right of action against third-parties.'" (JA 155).   Thus, the anti-alienation provision required by section 1.409A-3(f) of the Treasury Regulations does not create substantive rights that the plan participant can enforce to prevent alienation of the plan benefits, even if alienation of those benefits may result in the loss of the tax deferral.   See In re

---

the pertinent Treasury Regulations, it does not speak to either: (i) the enforceability of that provision against third-party creditors; or (ii) the potential tax consequences of a writ of garnishment attaching to payments under a top hat plan as they become due.  In any event, that treatise is not binding on this Court. Also, it is noteworthy that the treatise was published by Sposato's counsel on June 21, 2012, which was during the pendency of this suit filed on May 24, 2012.

Witwer, 148 B.R. 930, 937 (C.D. Cal. 1992). Although neither party has cited to a case dealing with the enforceability of anti-alienation provisions against third parties under section 409A of the IRC, courts have addressed such anti-alienation provisions and their enforceability under section 401(a) of the IRC.[30]

In Witwer, the debtor attempted to enforce the anti-alienation provision of a pension to exclude the plan benefits from the bankruptcy estate. 148 B.R. at 936. The court found that, although the IRC required the pension plan to include an anti-alienation provision, that fact did not make the anti-alienation provision enforceable against third parties. Id. at 937. The court explained:

> The provisions of IRC § 401(a) relate solely to the criteria for tax qualification under the Internal Revenue Code. Although a transfer in violation of the required anti-alienation provision could result in adverse tax consequences, I.R.C. § 401(a) does not appear to create any substantive rights that a beneficiary or participant of a qualified retirement trust can enforce.

Id. (citing Nolan v. Meyer, 520 F.2d 1276, 1290 (2d Cir. 1975), cert. denied, 423 U.S. 1034 (1975) (citations omitted)).[31]

---

[30] Section 401(a) of the IRC and sections 1.401(a)-13(b)(1) of the Treasury Regulations require that, to be a qualified retirement plan, a plan must contain an anti-alienation provision. 26 U.S.C. § 401(a).

[31] See also Reklau v. Merchants Nat'l Corp., 808 F.2d 628, 631 (7th Cir. 1986); Cowan v. Keystone Employee Profit Sharing Fund, 586 F.2d 888, 890 n. 3 (1st Cir. 1978); Wiesner v. Romo Paper Prods. Corp., 514 F. Supp. 289, 291 n. 2 (E.D.N.Y. 1981); Vermeulen v. Cent. States, Se. and Sw. Areas Pension Fund, 490 F. Supp. 234, 237 n. 6 (M.D.N.C. 1980).

The holding in <u>Witwer</u> applies equally to this case. The Plan here contains an anti-alienation provision solely to comply with section 409A because, if it did not have such a provision, the Plan would lose tax benefits and incur tax penalties. Section 409A, and its related Treasury Regulations and Procedures, were enacted to enforce the tax laws so that retirement plans were properly taxed. As the District Court below correctly held, however, they do not give Sposato the ability to exempt his benefits from First Mariner's garnishment. (JA 155-56) (citing <u>In Re Witwer</u>, <u>supra</u>).[32]

Sposato's reliance on ERISA's civil enforcement provision in section 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)) as grounds for preemption is also flawed. Sposato contends that garnishment of Plan benefits would violate the plan anti-alienation provision and that section 502(a)(3) permits Sposato to enforce the plans terms. As the District Court pointed out, however, the Plan itself states that it is exempt from statutory anti-alienation requirement in Part 2 of the ERISA. (JA 153) (citing JA 24, ¶ 11.10). The plans anti-alienation provision only protects against claims of creditors "to the fullest extent allowed by law." (JA, ¶10.1).

---

[32] Despite the District Court's reliance on <u>Witwer</u> in reaching its decision, Sposato does not discuss this case in his opening Brief. In the proceedings below, Sposato argued that <u>Witwer</u> is not relevant to the instant action because it did not involve an ERISA plan. (JA 69-70). Should Sposato choose to repeat this argument in his Reply Brief, it is not persuasive. <u>Witwer</u> stands for the proposition that the IRC does not create substantive rights that a beneficiary can enforce against third parties. <u>Witwer</u>, 148 B.R. at 937. The fact that the plan at issue in <u>Witwer</u> was not an ERISA plan is immaterial.

Because the operative law – ERISA – does not protect Plan benefits from garnishment by third-party creditors, the plain language of the anti-alienation provision contradicts Sposato's argument. (JA 151, n. 1).[33]

In any event, the terms of the Plan do not preempt state law, only ERISA or other federal law would preempt state law.[34]  Section 502(a)(3) of ERISA actually supports First Mariner's contention that the Plan funds can be garnished.  As stated in Mackey, because a plan beneficiary like Sposato has the ability to sue an ERISA plan, ERISA contemplates that a plan could have a judgment entered against it. Mackey, 486 U.S. at 832-33.   A judgment is worthless without the ability to

---

[33]  In his opening Brief, Sposato cites Supreme Court precedent for the general proposition that "ERISA's focus [is] on what the plan provides." (Pl.'s Br. at 9) (citing U.S. Airways v. McCutchen, 133 S. Ct. 1537, 1548 (2013); accord Kennedy v. Plan Admin'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 300-04 (2009)).  Neither of these two cases deals with a top hat plan or the ability of a third-party creditor to garnish benefits under a top hat plan.  Rather, the Supreme Court acknowledged that ERISA plans, like other contracts, should be interpreted in accordance with "ordinary principles of contract interpretation." McCutchen, 133 S. Ct. at 1548-49; see also Kennedy, 555 U.S. at 304 (holding that plan administrator must pay benefits in accordance with the plan at issue). The District Court's proper application of contract principles to the Plan here, therefore, is consistent with the rationale employed in McCutchen and Kennedy.

[34] On this point, Sposato's reliance on Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 246-47 (2000) is misplaced.  In Harris, the Court recognized that Section 502(a)(3) does not limit "the universe of possible defendants" against whom a plan may be enforced. Id. at 246.  Unlike the situation in Harris, however, First Mariner's garnishment of plan benefits violates neither ERISA, nor the Plan itself for the reasons stated above.

enforce it and one of the permitted enforcement mechanisms is a writ of garnishment. See Mackey, 486 U.S. at 834.

### F.    The Plan Anti-Alienation Provision is Not Enforceable Against First Mariner.

In the absence of federal preemption, the enforceability of the plan anti-alienation provision is governed by state garnishment law. See e.g., Mackey, 486 U.S. at 839-41; AFLAC, 2012 WL 1903904, at *5-6.  No Maryland law prohibits First Mariner from garnishing Plan benefits. (JA 155) (citing Md. R. 2-645).  As the District Court correctly held, the plan anti-alienation provision is an agreement between two parties, Cecil Bank and Sposato. (JA 156). That contract provision is not enforceable against First Mariner, which is not a party to the agreement, but has a valid and lawful interest in the property as determined by the Maryland state court that issued the writs of garnishment. (JA 156).

Other courts similarly have refused to enforce such agreements against non-parties to an agreement. See, e.g., In re Wheat, 149 B.R. 1003, 1006, n. 6 (S.D. Fla. 1992) (holding that "a transfer restriction would not be enforceable under state contract law against people not party to the contract").  This concept is best illustrated by AFLAC, supra, which, as Sposato points out, is one of only two cases located by the parties that considered the specific ERISA issues presented here.[35]

---

[35] (Pl.'s Br. at 15-16).

As in this case, <u>AFLAC</u> involved writs of garnishment served by a judgment creditor on the administrator of a top hat pension plan (AFLAC) as to property of one its beneficiaries – the judgment debtor. <u>AFLAC</u>, 2012 WL 1903904, at *1. Like the Plan here, AFLAC's top hat plan contained an anti-alienation provision. <u>Id.</u> at *5. AFLAC filed a declaratory judgment action and sought guidance from that court as to whether the monthly payments that it owed to its beneficiary were subject to the writ of garnishment. <u>Id</u>. at *1. As a threshold matter, the court found that, because the AFLAC plan was a top hat pension plan, it was exempt from the anti-alienation provision of ERISA. <u>Id</u>. at *5. The court then found that there was no other federal law exempting the plan benefits from garnishment, and that, accordingly, the payments under the plan were subject to garnishment under Georgia law. <u>Id.</u> at *5-6.

Notwithstanding Sposato's misguided attempt to distinguish <u>AFLAC</u> on its facts,[36] the District Court's reliance on that decision was correct. Although it does not appear that the <u>AFLAC</u> court considered a preemption argument premised upon section 409A of the IRC as now raised by Sposato, the District Court below did and properly rejected it. (JA 154-56).

---

[36] Sposato points to the fact that, in <u>AFLAC</u>, the plan payments to the beneficiary were based on the settlement of a contested pension claim. (Pl.'s Br. at 16) (citing <u>AFLAC</u>, 2012 WL 1903904, at *6, n. 5). While the court in <u>AFLAC</u> noted this fact as an additional reason supporting its decision, its holding rested firmly on the court's proper rejection of the plaintiff's preemption argument, as followed by the District Court in this case. <u>Id</u>. at *5-6.

Sposato also relies heavily on <u>Maynard v. Merrill Lynch & Co.</u>, 8:07-cv-1149-T-23MSS, 2008 WL 4790670 (M.D. Fla. Oct. 28, 2008). That case did not involve an attempt to enforce a plan anti-alienation provision against a third-party creditor or an attempted garnishment of plan benefits. Rather, <u>Maynard</u> involved the attempted set-off against top hat plan benefits of amounts owed by the participant to his employer – in other words, between the parties to the contractual plan at issue. Although premised on a flawed rationale concerning the preemptive effect of section 409A of the IRC as addressed above, the ultimate result reached in <u>Maynard</u> of enforcing a plan anti-alienation provision against the plan's sponsor is consistent with District Court's ruling here. (JA 156). In <u>Maynard,</u> the court got to the right result for the wrong reasons. In properly rejecting the flawed rationale of <u>Maynard</u>, and following <u>AFLAC</u>, the District Court here reached the right result for right reasons. This Court, therefore, should affirm the District Court's ruling that the Plan benefits here are subject to garnishment by First Mariner.

**III.  The District Court Erred in Limiting First Mariner's Garnishments Pursuant to the CCPA.**

Although the District Court properly held that Plan benefits are fully subject to garnishment under Maryland law, it erred in finding that the CCPA limits First Mariner's garnishments to 25% of the Annual Payments made to Sposato under the Plan. (JA 207-08). Enacted to ensure continued means of subsistence for debtors

and their families,[37] the CCPA protects from garnishment 75% of a debtor's "disposable earnings." 15 U.S.C. § 1672(b). "Disposable earnings" are "that part of the ***earnings*** of any individual remaining after the deduction from those earnings of any amount required by law to be withheld." 15 U.S.C. § 1672(b) (emphasis added). Protected "earnings" are further defined as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus or otherwise, and includes ***periodic payments pursuant to a pension or retirement program***." 15 U.S.C. § 1672(a) (emphasis added).

Neither "periodic payments" nor "pension or retirement program" is defined by the CCPA. Focusing exclusively on what it perceived to be the plain language of those words within section 1672(a), the District Court held that the Annual Payments made under Sposato's Plan constitute protected "earnings" within the meaning of the CCPA. (JA 207). By interpreting the statutory definition of "earnings" in isolation, the District Court erroneously neglected to consider its meaning within the context of the CCPA as a whole, thereby frustrating the intent of Congress in adopting the legislation.

Although the task of statutory construction begins with the actual language of the provision in question, the inquiry does not end there. <u>Brown & Williamson Tobacco Corp. v. Food & Drug Admin.</u>, 153 F.3d 155, 162 (4th Cir. 1998) (internal

---

[37] <u>See</u> <u>U.S. v. DeCay</u>, 620 F.3d 534, 544 n.10 (5th Cir. 2010) (citing H.R. Rep. No. 1040, 90th Cong., 2d Sess. (1968), <u>reprinted in</u> 1968 U.S.C.C.A.N.1962 (1979)).

35

citations omitted).  Courts "must not be guided by a single sentence or member of a sentence," but instead must "look to the provisions of the whole law, and to its object and policy." <u>U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.</u>, 508 U.S. 439, 455 (1993) (internal citations omitted).  If the meaning of a single provision is not clear when read in the context of the statute as a whole, the Court can then look beyond the statutory language to ascertain congressional intent including, "the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and a consideration of other relevant statutes." <u>Brown & Williamson</u>, 153 F.3d at 162.  "In fact, if application of the plain language of a statute would produce a result demonstrably at odds with the intent of Congress . . . the intent of Congress rather than the strict language controls." <u>Id.</u> (internal citations omitted).

A.    **Annual Payments Under the Plan Are Not the Type of "Periodic Payments" Protected by the CCPA.**

To find meaning in the undefined term "periodic payments," Sposato directed the District Court, and now directs this Court, to a dictionary definition of that phrase as, "one in a series of payments made over time instead of a one-time payment for the full amount."[38]  Under this definition, any form of payment, other than a one-time payment, would be considered "periodic."  For example, if as opposed to annual payments, the Plan provided for benefits to be paid in five-year,

_____

[38] (Pl.'s Br. at 22) (citing <u>Black's Law Dictionary</u> at 1244 (9th ed. 2009)).

ten-year, or even twenty-year intervals, all of those "series of payments over time" would be "periodic" as defined by Black's Law Dictionary. Looking at the isolated phrase "periodic payments" in the context of a dictionary definition, therefore, does nothing to assist in understanding the type of "periodic payments" that Congress intended to protect under the CCPA. See Travelers, 514 U.S. at 656 (in light of "the unhelpful text and the frustrating difficulty of defining its key term," the court looked "instead to the objectives of the . . . statute as a guide").

For guidance, this Court should first look to how the statutory definition of "earnings" in section 1672 fits within the context of the substantive protections against garnishment afforded under section 1673(a). That section provides:

**(a) Maximum allowable garnishment**

Except as provided in subsection (b) of this section and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any *workweek* which is subjected to garnishment may not exceed

**(1)** 25 per centum of his disposable earnings for that *week*, or

**(2)** the amount by which his disposable earnings for that *week* exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable,

whichever is less. ***In the case of earnings for any pay period other than a week,*** the Secretary of Labor shall by regulation prescribe a multiple of the Federal minimum hourly wage equivalent in effect to that set forth in paragraph (2).

15 U.S.C. § 1673 (emphasis added).   Although permitting the Secretary of Labor by regulation to apply the statutory formulation within the context of "any pay period other than a week," the statute uses the "workweek" as its baseline periodic interval for determining the amount of "disposal earnings" that can be garnished. Id.  As to "any pay period other than a week," the statute is silent as what temporal intervals between each payment of "earnings" are considered "periodic" within the meaning of the statute.

The CCPA's reference to the "workweek" in section 1673(a) reflects Congress' intent in passing the statute.  Enacted in 1968 during then-President Johnson's "war on poverty," section 1673 of the CCPA was intended "to combat the problems of unemployment and bankruptcy that frequently resulted from the unrestricted garnishment of a debtor's wages." U.S. v. DeCay, 620 F.3d at 544 n.10 (5th Cir. 2010).[39]   Congress "explicitly recognized that unrestricted garnishment of a debtor's wages frequently resulted in a disruption of employment, production, and consumption, harming the debtor and interstate commerce." Id. (internal citations omitted).  The court in Decay held:

_____

[39] The statute stemmed from President Johnson's statement lamenting the effect of wage garnishments on the working poor: "Hundreds of workers among the poor lose their jobs or most of their wages each year as a result of garnishment proceedings. . . .steps should be taken to protect the hard-earned wages and the jobs of those who need the income most."  (H.R. Rep. No. 1040, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N.1962, 1979).

38

> Retirement benefits, like wages, are intended to provide a continued means of support for him and his family. Congress incorporated § 303 of the CCPA into the [MVRA], recognizing that the purpose of a restitution [or garnishment] order would ***be thwarted if it simultaneously turned the judgment-debtor into a ward of the state and denied the debtor the ability to insure continued means of support for him and his family***.

<u>Id.</u> (emphasis added).

In light of Congress' intent to protect the subsistence needs of debtors and their families from garnishment, it is easy to understand why the statute uses the "workweek" as the baseline periodic interval for calculating the amount of disposable earnings that are protected. As for "any period other than a week," guidance is found in the regulations promulgated to enforce it. Section 1673 specifically charges the Secretary of Labor with prescribing a multiple of the federal minimum hourly wage equivalent pursuant to section 1672(a)(2), which can be found in 29 CFR § 870.10. Significantly, the regulation uses the terms "weekly, bi-weekly, semimonthly and monthly pay periods" and categorizes the pay periods using the term "workweeks or fractions thereof." <u>Id.</u> The regulation neither references nor contemplates annual payments of "earnings." This is consistent with the statutory language of section 1673(a)(1), which limits

garnishment to 25% of disposable earnings for the "week" during which the garnishment is had.[40]

Based on this statutory and regulatory framework, the Supreme Court recognizes that the CCPA is intended to protect "periodic payments of compensation needed to support the wage earner and his family on *a week-to-week*, *month-to-month basis*." Kokoszka v. Belford, 417 U.S. 642, 651 (1974) (emphasis added) (superseded by statute on other grounds); see also U.S. v. Cooper, No. 02-40069-SAC, 2006 WL 3512936, at *5 (D. Kan. Nov. 1, 2006). Here, the Annual Payments paid to Sposato under the Plan are not "periodic payments" necessary for subsistence "on a week-to-week, month-to-month basis," and, thus, are not protected by the CCPA.

In rejecting this argument, the District Court acknowledged that this Court "has not decided whether annual payments satisfy the terms of the CCPA." (JA 207). Looking to other circuits, the District Court stated that, "the Seventh Circuit

---

[40] Sposato argues that "any" period longer than 1 week, including annual payments, are implied in the regulations and applicable to the CCPA. (Pl.'s Br. at 23-24) (citing 29 C.F.R. § 870.10(c)). Section 870.10(c) of the regulation however, does not include the term "any." Rather, in applying the 25% formula to "a pay period longer than 1 week," the Department of Labor uses the terms "weekly," "biweekly," "semi-monthly," and "monthly." See generally, 29 C.F.R. § 870.10(c). The effect of Sposato's flawed construction of the regulation would be to transform the statutory reference "*any* pay period other than a week" to a mandate that the Department of Labor pass regulations for *all* conceivable pay periods longer than one week. The fact that annual payments are not included in the regulation, therefore, supports the view that annual payments are not protected by the CCPA.

has held that the CCPA protects annual payments from an employee's retirement savings plans." (Id.) (citing United States v. Lee, 659 F.3d 619, 622 (7th Cir. 2011) (citing DeCay, 620 F.3d at 544)). The District Court's reliance on Lee was misplaced. Although factually Lee involved annual payments made under a 401(K) plan, the periodic nature of the payments was not at issue. Rather, in attempting to seize the defendants' annual 401(K) benefits pursuant to MVRA, the federal government's sole argument was that, while payments "to" a retirement plan are subject of the CCPA, payments "from" a retirement plan are not subject to the CCPA. See United States v. Lee, 2011 WL 1837472, at *19-22 (2011) (Appellee's Brief). In addressing that issue, the Seventh Circuit looked to the definition of "pursuant to" in Black's Law Dictionary to hold that whether the payments were to or from the retirement plan at issue they constituted protected "earnings" under the CCPA. Lee, 659 F.3d at 622.[41] The Seventh Circuit did not address the definition of the term "periodic" within the context of the legislative history of the CCPA and the regulations enforcing it.

The case upon which the Seventh Circuit relied, DeCay, supra, reinforces this point. As in Lee, the focus of the DeCay decision was the phrase "pursuant

---

[41] While the Seventh Circuit viewed Black's Law Dictionary as sufficient guidance to construe the phrase "pursuant to," use of that same dictionary is not sufficient for purposes of ascertaining the intent of the phrase "periodic payments" for the reasons explained above.

to" in the statutory definition of "earnings." <u>Decay</u>, 620 F.3d at 544. Although the Fifth Circuit held that the phrase "pursuant to" is unambiguous, <u>DeCay</u> never addressed the "periodic payments" issue raised in this case. Sposato's reliance on <u>DeCay</u> for the broad proposition that the entire definition of "earnings" under the CCPA is "unambiguous"[42] is misplaced and overstates the holding in <u>DeCay</u>. Contrary to Sposato's argument and the holding of the District Court, the Annual Payments due to Sposato are not protected by the CCPA.

### B.   Sposato's Top Hat Plan is Not the Type of "Pension or Retirement Program" Protected by the CCPA.

Regardless of the timing of the payments paid to Sposato under the Plan, they are still not protected by the CCPA because the Plan is not a "pension or retirement program" within the meaning of the statute. <u>See</u> 15 U.S.C. § 1672(a). Although the Plan is indisputably a "pension ***plan***" within the meaning ERISA, it is not the type of "pension or retirement ***program***" protected by the CCPA. While courts can look to other federal statutes in interpreting an undefined term in the statute at issue, that exercise is not helpful here, as it would lead to an erroneous result in derogation of the legislative intent of the CCPA.

The CCPA's use of the word "program" reflects the fact that it was enacted six years prior to the 1974 ERISA statute, which recognized top hat plans as a form of tax-deferred pension "plan." Unlike other forms of qualified plans (such as the

---

[42] (Pl.'s Br. at 22).

401(K) at issue in <u>Lee</u>) that are generally available to a broader base of employees, top hat plans are typically "supplemental" and offered as a perquisites to high-level executives, such as Sposato.  Clearly, payments made under this type of ERISA "plan" are not the type of "pension or retirement programs" that Congress envisioned or sought to protect when it passed the CCPA in 1968.  Unlike traditional pension and retirement programs generally available to rank and file employees, a top hat plan is not intended as a means of meeting the subsistence needs of the retiree or his family.  Rather, it is simply a form of tax-deferred compensation paid to sophisticated executives who are statutorily presumed to know how to handle their personal financial affairs.

First Mariner is unaware of any reported decision that has addressed the issue of whether a top hat plan qualifies as a "pension or retirement program" under the CCPA.  In <u>AFLAC</u>, <u>supra</u>, the district court held that the retired debtor's top hat payments were limited to 25% under Georgia garnishment law, Ga. Code Ann., § 18-4-20, which defined earnings similarly to section 1672 of the CCPA. <u>Id.</u>, 2012 WL 1903904, at *6-7.  In holding that the top hat plan benefits were protected by the Georgia statute, the court found no Georgia case law or legislative intent in that state statute that top hat payments "should be carved out of the disposable earnings protected by the statute's twenty-five percent limitation." <u>Id.</u> at *7.  The court did not address the issue under the CCPA, which (as explained

43

above) was never intended by Congress to protect top hat plans typically provided as perquisites to high-level management. Furthermore, in <u>AFLAC</u>, the top hat plan payments were monthly and, therefore, more readily available to meet the daily subsistence needs of the debtor and his family than the Annual Payments due to Sposato here. <u>Id.</u> at *1. On the CCPA issue, therefore, <u>AFLAC</u> is inapposite.[43]

That Sposato racked up over $5.3 million in debt to First Mariner that he now claims (without record support) he is unable to repay, cannot and should not alter the proper interpretation and application of federal law. Neither the CCPA, nor ERISA for that matter, was intended to protect sophisticated high-level executives like Sposato from themselves.

## <u>CONCLUSION</u>

For all the foregoing reasons, First Mariner respectfully requests that the District Court's holding that Plan benefits paid to Sposato are fully subject to garnishment by First Mariner Bank under Maryland law should be affirmed. (JA. 150-59; 202-206). The District Court's holding that 75% of each such Annual Payment is shielded from garnishment under the CCPA (JA 207-208), however, should be reversed. That part of the final judgment should be remanded to the

---

[43] Finally, even if (as Sposato incorrectly asserts) the plain language of section 1672 renders his Plan a "pension or retirement program," under the CCPA, that language "would produce a result so demonstrably at odds with the intent of Congress" that the plain language would not control. <u>Brown & Williamson</u>, 153 F.3d at 162.

District Court with instructions to enter an Order that 100% of each Annual Payment to Sposato under the Plan is subject to First Mariner's garnishments as they become due and payable.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), First Mariner respectfully requests oral argument. This is a case of first impression in this Court with respect to the issues raised under ERISA and the CCPA. Its outcome is important to all judgment creditors in the United States, as it will provide guidance to them in determining whether payments under top hat plan can be garnished to satisfy valid money judgments.

Respectfully Submitted,

/s/ Michael A. Brown
Michael A. Brown
Michael E. Blumenfeld
John E. McCann, Jr.
Derek P. Roussillon
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Phone: (410) 727-6464
Fax: (410) 385-3700
mbrown@milesstockbridge.com
mblumenfeld@milesstockbridge.com
jmccann@milesstockbridge.com
droussillon@milesstockbridge.com

*Attorneys for Appellee and Cross-Appellant, First Mariner Bank*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>11,126</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

    <u>/s/ Michael A. Brown</u>
    Michael A. Brown

Dated: January 17, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 17, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Saul A. Ehrenpreis
Irving E. Walker
COLE, SCHOTZ, MEISEL, FOREMAN
     & LEONARD, P.A.
300 East Lombard Street
Baltimore, MD 21202
(410) 230-0660

*Counsel for Appellant/Cross-Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Adrienne R. Acra-Passehl
Adrienne R. Acra-Passehl
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA 23219

# SUPPLEMENTAL STATUTORY ADDENDUM

# SUPPLEMENTAL STATUTORY ADDENDUM

## <u>TABLE OF CONTENTS</u>[1]

<u>PAGE</u>

**<u>STATUTES</u>**

26 U.S.C. § 7805 ....................................................................... S. Add. 1

29 U.S.C. § 1056 ...................................................................... S. Add. 3

**<u>REGULATIONS</u>**

Treas. Reg. § 601.601 ............................................................. S. Add. 12

Rev. Proc. 92-65 §3(01) ......................................................... S. Add. 18

**<u>RULES</u>**

Md. Rule 2-645 ....................................................................... S. Add. 22

---

[1] To the extent that a statute, rule or regulation necessary to a determination of the issues in this case was included in the Statutory Addendum attached to Sposato's Opening Brief, First Mariner does not reproduce it here.  Rather, First Mariner reproduces in this Addendum only those additional statutes, rule and regulations necessary to a determination of the issue in this case that are not included in Sposato's Addendum.



title 18, United States Code, shall apply to volunteers as if they were employees of the United States.

"(2) EXPENSES.—Amounts received by volunteers serving in any program carried out under this section as reimbursement for expenses are exempt from taxation under chapters 1 and 21 of the Internal Revenue Code of 1986 [formerly I.R.C. 1954].

"(d) PUBLICITY RELATING TO INCOME TAX PROVISIONS PARTICULARLY IMPORTANT TO THE ELDERLY.—The Secretary shall, from time to time, undertake to direct the attention of elderly individuals to those provisions of the Internal Revenue Code of 1986 which are particularly important to taxpayers who are elderly individuals, such as the provisions of section 37 (relating to credit for the elderly) and section 121 (relating to one-time exclusion of gain from sale of principal residence) of the Internal Revenue Code of 1986.

"(e) DEFINITIONS.—For purposes of this section—

"(1) The term 'Secretary' means the Secretary of the Treasury or his delegate.

"(2) The term 'elderly individual' means an individual who has attained the age of 60 years as of the close of his taxable year.

"(3) The term 'Federal income tax return' means any return required under chapter 61 of the Internal Revenue Code of 1986 with respect to the tax imposed on an individual under chapter 1 of such Code.

"(f) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for the purpose of carrying out the provisions of this section $2,500,000 for the fiscal year ending September 30, 1979, and $3,500,000 for the fiscal year ending September 30, 1980.''

## § 7805. Rules and regulations

### (a) Authorization

Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

### (b) Retroactivity of regulations

#### (1) In general

Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:

(A) The date on which such regulation is filed with the Federal Register.

(B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.

(C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

#### (2) Exception for promptly issued regulations

Paragraph (1) shall not apply to regulations filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates.

#### (3) Prevention of abuse

The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.

#### (4) Correction of procedural defects

The Secretary may provide that any regulation may apply retroactively to correct a procedural defect in the issuance of any prior regulation.

#### (5) Internal regulations

The limitation of paragraph (1) shall not apply to any regulation relating to internal Treasury Department policies, practices, or procedures.

#### (6) Congressional authorization

The limitation of paragraph (1) may be superseded by a legislative grant from Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

#### (7) Election to apply retroactively

The Secretary may provide for any taxpayer to elect to apply any regulation before the dates specified in paragraph (1).

#### (8) Application to rulings

The Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect.

### (c) Preparation and distribution of regulations, forms, stamps, and other matters

The Secretary shall prepare and distribute all the instructions, regulations, directions, forms, blanks, stamps, and other matters pertaining to the assessment and collection of internal revenue.

### (d) Manner of making elections prescribed by Secretary

Except to the extent otherwise provided by this title, any election under this title shall be made at such time and in such manner as the Secretary shall prescribe.

### (e) Temporary regulations

#### (1) Issuance

Any temporary regulation issued by the Secretary shall also be issued as a proposed regulation.

#### (2) 3-year duration

Any temporary regulation shall expire within 3 years after the date of issuance of such regulation.

### (f) Review of impact of regulations on small business

#### (1) Submissions to Small Business Administration

After publication of any proposed or temporary regulation by the Secretary, the Secretary shall submit such regulation to the Chief Counsel for Advocacy of the Small Business Administration for comment on the impact of such regulation on small business. Not later than the date 4 weeks after the date of such submission, the Chief Counsel for Advocacy shall submit comments on such regulation to the Secretary.

#### (2) Consideration of comments

In prescribing any final regulation which supersedes a proposed or temporary regulation which had been submitted under this subsection to the Chief Counsel for Advocacy of the Small Business Administration—

(A) the Secretary shall consider the comments of the Chief Counsel for Advocacy on such proposed or temporary regulation, and

(B) the Secretary shall discuss any response to such comments in the preamble of such final regulation.

**(3) Submission of certain final regulations**

In the case of the promulgation by the Secretary of any final regulation (other than a temporary regulation) which does not supersede a proposed regulation, the requirements of paragraphs (1) and (2) shall apply; except that—

(A) the submission under paragraph (1) shall be made at least 4 weeks before the date of such promulgation, and

(B) the consideration (and discussion) required under paragraph (2) shall be made in connection with the promulgation of such final regulation.

(Aug. 16, 1954, ch. 736, 68A Stat. 917; Pub. L. 94–455, title XIX, §1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 98–369, div. A, title I, §43(b), July 18, 1984, 98 Stat. 558; Pub. L. 100–647, title VI, §6232(a), Nov. 10, 1988, 102 Stat. 3734; Pub. L. 101–508, title XI, §11621(a), Nov. 5, 1990, 104 Stat. 1388–503; Pub. L. 104–168, title XI, §1101(a), July 30, 1996, 110 Stat. 1468; Pub. L. 105–206, title III, §3704, July 22, 1998, 112 Stat. 777.)

AMENDMENTS

1998—Subsec. (d). Pub. L. 105–206 struck out "by regulations or forms" before "prescribe".

1996—Subsec. (b). Pub. L. 104–168 struck out "or rulings" after "regulations" in heading and amended text generally. Prior to amendment, text read as follows: "The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

1990—Subsec. (f). Pub. L. 101–508 substituted heading for one which read "Impact of regulations on small business reviewed" and amended text generally. Prior to amendment, text read as follows: "After the publication of any proposed regulation by the Secretary and before the promulgation of any final regulation by the Secretary which does not supersede a proposed regulation, the Secretary shall submit such regulation to the Administrator of the Small Business Administration for comment on the impact of such regulation on small business. The Administrator shall have 4 weeks from the date of submission to respond."

1988—Subsecs. (e), (f). Pub. L. 100–647 added subsecs. (e) and (f).

1984—Pub. L. 98–369 added subsec. (d).

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary" wherever appearing.

EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–168, title XI, §1101(b), July 30, 1996, 110 Stat. 1469, provided that: "The amendment made by subsection (a) [amending this section] shall apply with respect to regulations which relate to statutory provisions enacted on or after the date of the enactment of this Act [July 30, 1996]."

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–508, title XI, §11621(b), Nov. 5, 1990, 104 Stat. 1388–504, provided that: "The amendment made by subsection (a) [amending this section] shall apply to regulations issued after the date which is 30 days after the date of the enactment of this Act [Nov. 5, 1990]."

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–647, title VI, §6232(b), Nov. 10, 1988, 102 Stat. 3735, provided that: "The amendments made by this section [amending this section] shall apply to any regulation issued after the date which is 10 days after the date of the enactment of this Act [Nov. 10, 1988]."

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 applicable to taxable years ending after July 18, 1984, see section 44 of Pub. L. 98–369, set out as an Effective Date note under section 1271 of this title.

INTERNET AVAILABILITY

Pub. L. 105–206, title II, §2003(d), July 22, 1998, 112 Stat. 725, provided that: "In the case of taxable periods beginning after December 31, 1998, the Secretary of the Treasury or the Secretary's delegate shall establish procedures for all tax forms, instructions, and publications created in the most recent 5-year period to be made available electronically on the Internet in a searchable database at approximately the same time such records are available to the public in paper form. In addition, in the case of taxable periods beginning after December 31, 1998, the Secretary of the Treasury or the Secretary's delegate shall, to the extent practicable, establish procedures for other taxpayer guidance to be made available electronically on the Internet in a searchable database at approximately the same time such guidance is available to the public in paper form."

**§ 7806. Construction of title**

**(a) Cross references**

The cross references in this title to other portions of the title, or other provisions of law, where the word "see" is used, are made only for convenience, and shall be given no legal effect.

**(b) Arrangement and classification**

No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title, nor shall any table of contents, table of cross references, or similar outline, analysis, or descriptive matter relating to the contents of this title be given any legal effect. The preceding sentence also applies to the sidenotes and ancillary tables contained in the various prints of this Act before its enactment into law.

(Aug. 16, 1954, ch. 736, 68A Stat. 917.)

REFERENCES IN TEXT

This Act, referred to in subsec. (b), is act Aug. 16, 1954.

**§ 7807. Rules in effect upon enactment of this title**

**(a) Interim provision for administration of title**

Until regulations are promulgated under any provision of this title which depends for its application upon the promulgation of regulations (or which is to be applied in such manner as may be prescribed by regulations) all instructions, rules or regulations which are in effect immediately prior to the enactment of this title shall, to the extent such instructions, rules, or regulations could be prescribed as regulations under authority of such provision, be applied as if promulgated as regulations under such provision.

**(b) Provisions of this title corresponding to prior internal revenue laws**

**(1) Reference to law applicable to prior period**

Any provision of this title which refers to the application of any portion of this title to



98–397, to which such amendment relates, except as otherwise provided, see section 1898(j) of Pub. L. 99–514, set out as a note under section 401 of Title 26.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–397 applicable to plan years beginning after Dec. 31, 1984, except as otherwise provided, see sections 302 and 303 of Pub. L. 98–397, set out as a note under section 1001 of this title.

Nothing in amendment by Pub. L. 98–397 to prevent any distribution required by reason of failure to comply with terms of loan made on or before Aug. 18, 1985, and secured by portion of participant's accrued benefit, see section 1898(b)(4)(C)(ii) of Pub. L. 99–514, set out as an Effective Date of 1986 Amendment note under section 417 of Title 26, Internal Revenue Code.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1998

For provisions directing that if any amendments made by subtitle D [§§ 1401–1465] of title I of Pub. L. 104–188 require an amendment to any plan or annuity contract, such amendment shall not be required to be made before the first day of the first plan year beginning on or after Jan. 1, 1998, see section 1465 of Pub. L. 104–188, set out as a note under section 401 of Title 26, Internal Revenue Code.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

### § 1056. Form and payment of benefits

**(a) Commencement date for payment of benefits**

Each pension plan shall provide that unless the participant otherwise elects, the payment of benefits under the plan to the participant shall begin not later than the 60th day after the latest of the close of the plan year in which—

(1) occurs the date on which the participant attains the earlier of age 65 or the normal retirement age specified under the plan,

(2) occurs the 10th anniversary of the year in which the participant commenced participation in the plan, or

(3) the participant terminates his service with the employer.

In the case of a plan which provides for the payment of an early retirement benefit, such plan shall provide that a participant who satisfied the service requirements for such early retirement benefit, but separated from the service (with any nonforfeitable right to an accrued benefit) before satisfying the age requirement for such early retirement benefit, is entitled upon satisfaction of such age requirement to receive a benefit not less than the benefit to which he would be entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury.

**(b) Decrease in plan benefits by reason of increases in benefit levels under Social Security Act or Railroad Retirement Act of 1937**

If—

(1) a participant or beneficiary is receiving benefits under a pension plan, or

(2) a participant is separated from the service and has non-forfeitable rights to benefits,

a plan may not decrease benefits of such a participant by reason of any increase in the benefit levels payable under title II of the Social Security Act [42 U.S.C. 401 et seq.] or the Railroad Retirement Act of 1937 [45 U.S.C. 231 et seq.] or any increase in the wage base under such title II, if such increase takes place after September 2, 1974, or (if later) the earlier of the date of first entitlement of such benefits or the date of such separation.

**(c) Forfeiture of accrued benefits derived from employer contributions**

No pension plan may provide that any part of a participant's accrued benefit derived from employer contributions (whether or not otherwise nonforfeitable) is forfeitable solely because of withdrawal by such participant of any amount attributable to the benefit derived from contributions made by such participant. The preceding sentence shall not apply (1) to the accrued benefit of any participant unless, at the time of such withdrawal, such participant has a nonforfeitable right to at least 50 percent of such accrued benefit, or (2) to the extent that an accrued benefit is permitted to be forfeited in accordance with section 1053(a)(3)(D)(iii) of this title.

**(d) Assignment or alienation of plan benefits**

(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

(2) For the purposes of paragraph (1) of this subsection, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment, or of any irrevocable assignment or alienation of benefits executed before September 2, 1974. The preceding sentence shall not apply to any assignment or alienation made for the purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued non-forfeitable benefit and is exempt from the tax imposed by section 4975 of title 26 (relating to tax on prohibited transactions) by reason of section 4975(d)(1) of title 26.

(3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

(B) For purposes of this paragraph—

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under an order previously determined to be a qualified domestic relations order.

(E)(i) A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee—

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

For purposes of subclause (II), the interest rate assumption used in determining the present value shall be the interest rate specified in the plan or, if no rate is specified, 5 percent.

(ii) For purposes of this subparagraph, the term "earliest retirement age" means the earlier of—

(I) the date on which the participant is entitled to a distribution under the plan, or

(II) the later of the date of the participant attains age 50 or the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.

(F) To the extent provided in any qualified domestic relations order—

(i) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes), and

(ii) if married for at least 1 year, the surviving former spouse shall be treated as meeting the requirements of section 1055(f) of this title.

(G)(i) In the case of any domestic relations order received by a plan—

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

(ii) Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Such procedures—

(I) shall be in writing,

(II) shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the plan of the domestic relations order, and

(III) shall permit an alternate payee to designate a representative for receipt of copies of notices that are sent to the alternate payee with respect to a domestic relations order.

(H)(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18-month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18-month period described in clause (v)—

(I) it is determined that the order is not a qualified domestic relations order, or

(II) the issue as to whether such order is a qualified domestic relations order is not resolved,

then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18-month period described in this clause is the 18-month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

(I) If a plan fiduciary acts in accordance with part 4 of this subtitle in—

(i) treating a domestic relations order as being (or not being) a qualified domestic relations order, or

(ii) taking action under subparagraph (H),

then the plan's obligation to the participant and each alternate payee shall be discharged to the extent of any payment made pursuant to such Act.

(J) A person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan. Nothing in the preceding sentence shall permit a requirement under section 1301 of this title of the payment of more than 1 premium with respect to a participant for any period.

(K) The term "alternate payee" means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

(L) This paragraph shall not apply to any plan to which paragraph (1) does not apply.

(M) Payment of benefits by a pension plan in accordance with the applicable requirements of a qualified domestic relations order shall not be treated as garnishment for purposes of section 1673(a) of title 15.

(N) In prescribing regulations under this paragraph, the Secretary shall consult with the Secretary of the Treasury.

(4) Paragraph (1) shall not apply to any offset of a participant's benefits provided under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan if—

(A) the order or requirement to pay arises—

(i) under a judgment of conviction for a crime involving such plan,

(ii) under a civil judgment (including a consent order or decree) entered by a court in an action brought in connection with a violation (or alleged violation) of part 4 of this subtitle, or

(iii) pursuant to a settlement agreement between the Secretary and the participant, or a settlement agreement between the Pension Benefit Guaranty Corporation and the

participant, in connection with a violation (or alleged violation) of part 4 of this subtitle by a fiduciary or any other person,

(B) the judgment, order, decree, or settlement agreement expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan, and

(C) in a case in which the survivor annuity requirements of section 1055 of this title apply with respect to distributions from the plan to the participant, if the participant has a spouse at the time at which the offset is to be made—

(i) either—

(I) such spouse has consented in writing to such offset and such consent is witnessed by a notary public or representative of the plan (or it is established to the satisfaction of a plan representative that such consent may not be obtained by reason of circumstances described in section 1055(c)(2)(B) of this title), or

(II) an election to waive the right of the spouse to a qualified joint and survivor annuity or a qualified preretirement survivor annuity is in effect in accordance with the requirements of section 1055(c) of this title,

(ii) such spouse is ordered or required in such judgment, order, decree, or settlement to pay an amount to the plan in connection with a violation of part 4 of this subtitle, or

(iii) in such judgment, order, decree, or settlement, such spouse retains the right to receive the survivor annuity under a qualified joint and survivor annuity provided pursuant to section 1055(a)(1) of this title and under a qualified preretirement survivor annuity provided pursuant to section 1055(a)(2) of this title, determined in accordance with paragraph (5).

A plan shall not be treated as failing to meet the requirements of section 1055 of this title solely by reason of an offset under this paragraph.

(5)(A) The survivor annuity described in paragraph (4)(C)(iii) shall be determined as if—

(i) the participant terminated employment on the date of the offset,

(ii) there was no offset,

(iii) the plan permitted commencement of benefits only on or after normal retirement age,

(iv) the plan provided only the minimum-required qualified joint and survivor annuity, and

(v) the amount of the qualified preretirement survivor annuity under the plan is equal to the amount of the survivor annuity payable under the minimum-required qualified joint and survivor annuity.

(B) For purposes of this paragraph, the term "minimum-required qualified joint and survivor annuity" means the qualified joint and survivor annuity which is the actuarial equivalent of the participant's accrued benefit (within the meaning of section 1002(23) of this title) and under which the survivor annuity is 50 percent of the

amount of the annuity which is payable during the joint lives of the participant and the spouse.

**(e) Limitation on distributions other than life annuities paid by plan**

**(1) In general**

Notwithstanding any other provision of this part, the fiduciary of a pension plan that is subject to the additional funding requirements of section 1083(j)(4) of this title shall not permit a prohibited payment to be made from a plan during a period in which such plan has a liquidity shortfall (as defined in section 1083(j)(4)(E)(i) of this title).

**(2) Prohibited payment**

For purposes of paragraph (1), the term "prohibited payment" means—

(A) any payment, in excess of the monthly amount paid under a single life annuity (plus any social security supplements described in the last sentence of section 1054(b)(1)(G) of this title), to a participant or beneficiary whose annuity starting date (as defined in section 1055(h)(2) of this title), that occurs during the period referred to in paragraph (1),

(B) any payment for the purchase of an irrevocable commitment from an insurer to pay benefits, and

(C) any other payment specified by the Secretary of the Treasury by regulations.

**(3) Period of shortfall**

For purposes of this subsection, a plan has a liquidity shortfall during the period that there is an underpayment of an installment under section 1083(j)(3) of this title by reason of section 1083(j)(4)(A) of this title.

**(4) Coordination with other provisions**

Compliance with this subsection shall not constitute a violation of any other provision of this chapter.

**(f) Missing participants in terminated plans**

In the case of a plan covered by section 1350 of this title, upon termination of the plan, benefits of missing participants shall be treated in accordance with section 1350 of this title.

**(g) Funding-based limits on benefits and benefit accruals under single-employer plans**

**(1) Funding-based limitation on shutdown benefits and other unpredictable contingent event benefits under single-employer plans**

**(A) In general**

If a participant of a defined benefit plan which is a single-employer plan is entitled to an unpredictable contingent event benefit payable with respect to any event occurring during any plan year, the plan shall provide that such benefit may not be provided if the adjusted funding target attainment percentage for such plan year—

(i) is less than 60 percent, or

(ii) would be less than 60 percent taking into account such occurrence.

**(B) Exemption**

Subparagraph (A) shall cease to apply with respect to any plan year, effective as of the first day of the plan year, upon payment by the plan sponsor of a contribution (in addition to any minimum required contribution under section 1083 of this title) equal to—

(i) in the case of subparagraph (A)(i), the amount of the increase in the funding target of the plan (under section 1083 of this title) for the plan year attributable to the occurrence referred to in subparagraph (A), and

(ii) in the case of subparagraph (A)(ii), the amount sufficient to result in an adjusted funding target attainment percentage of 60 percent.

**(C) Unpredictable contingent event benefit**

For purposes of this paragraph, the term "unpredictable contingent event benefit" means any benefit payable solely by reason of—

(i) a plant shutdown (or similar event, as determined by the Secretary of the Treasury), or

(ii) an event other than the attainment of any age, performance of any service, receipt or derivation of any compensation, or occurrence of death or disability.

**(2) Limitations on plan amendments increasing liability for benefits**

**(A) In general**

No amendment to a defined benefit plan which is a single-employer plan which has the effect of increasing liabilities of the plan by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accrual, or changing the rate at which benefits become nonforfeitable may take effect during any plan year if the adjusted funding target attainment percentage for such plan year is—

(i) less than 80 percent, or

(ii) would be less than 80 percent taking into account such amendment.

**(B) Exemption**

Subparagraph (A) shall cease to apply with respect to any plan year, effective as of the first day of the plan year (or if later, the effective date of the amendment), upon payment by the plan sponsor of a contribution (in addition to any minimum required contribution under section 1083 of this title) equal to—

(i) in the case of subparagraph (A)(i), the amount of the increase in the funding target of the plan (under section 1083 of this title) for the plan year attributable to the amendment, and

(ii) in the case of subparagraph (A)(ii), the amount sufficient to result in an adjusted funding target attainment percentage of 80 percent.

**(C) Exception for certain benefit increases**

Subparagraph (A) shall not apply to any amendment which provides for an increase in benefits under a formula which is not based on a participant's compensation, but only if the rate of such increase is not in excess of the contemporaneous rate of increase in average wages of participants covered by the amendment.

S. Add. 6

**(3) Limitations on accelerated benefit distributions**

**(A) Funding percentage less than 60 percent**

A defined benefit plan which is a single-employer plan shall provide that, in any case in which the plan's adjusted funding target attainment percentage for a plan year is less than 60 percent, the plan may not pay any prohibited payment after the valuation date for the plan year.

**(B) Bankruptcy**

A defined benefit plan which is a single-employer plan shall provide that, during any period in which the plan sponsor is a debtor in a case under title 11 or similar Federal or State law, the plan may not pay any prohibited payment. The preceding sentence shall not apply on or after the date on which the enrolled actuary of the plan certifies that the adjusted funding target attainment percentage of such plan is not less than 100 percent.

**(C) Limited payment if percentage at least 60 percent but less than 80 percent**

**(i) In general**

A defined benefit plan which is a single-employer plan shall provide that, in any case in which the plan's adjusted funding target attainment percentage for a plan year is 60 percent or greater but less than 80 percent, the plan may not pay any prohibited payment after the valuation date for the plan year to the extent the amount of the payment exceeds the lesser of—

(I) 50 percent of the amount of the payment which could be made without regard to this subsection, or

(II) the present value (determined under guidance prescribed by the Pension Benefit Guaranty Corporation, using the interest and mortality assumptions under section 1055(g) of this title) of the maximum guarantee with respect to the participant under section 1322 of this title.

**(ii) One-time application**

**(I) In general**

The plan shall also provide that only 1 prohibited payment meeting the requirements of clause (i) may be made with respect to any participant during any period of consecutive plan years to which the limitations under either subparagraph (A) or (B) or this subparagraph applies.

**(II) Treatment of beneficiaries**

For purposes of this clause, a participant and any beneficiary on his behalf (including an alternate payee, as defined in subsection (d)(3)(K)) shall be treated as 1 participant. If the accrued benefit of a participant is allocated to such an alternate payee and 1 or more other persons, the amount under clause (i) shall be allocated among such persons in the same manner as the accrued benefit is allocated unless the qualified domestic relations order (as defined in subsection (d)(3)(B)(i)) provides otherwise.

**(D) Exception**

This paragraph shall not apply to any plan for any plan year if the terms of such plan (as in effect for the period beginning on September 1, 2005, and ending with such plan year) provide for no benefit accruals with respect to any participant during such period.

**(E) Prohibited payment**

For purpose[1] of this paragraph, the term "prohibited payment" means—

(i) any payment, in excess of the monthly amount paid under a single life annuity (plus any social security supplements described in the last sentence of section 1054(b)(1)(G) of this title), to a participant or beneficiary whose annuity starting date (as defined in section 1055(h)(2) of this title) occurs during any period a limitation under subparagraph (A) or (B) is in effect,

(ii) any payment for the purchase of an irrevocable commitment from an insurer to pay benefits, and

(iii) any other payment specified by the Secretary of the Treasury by regulations.

Such term shall not include the payment of a benefit which under section 1053(e) of this title may be immediately distributed without the consent of the participant.

**(4) Limitation on benefit accruals for plans with severe funding shortfalls**

**(A) In general**

A defined benefit plan which is a single-employer plan shall provide that, in any case in which the plan's adjusted funding target attainment percentage for a plan year is less than 60 percent, benefit accruals under the plan shall cease as of the valuation date for the plan year.

**(B) Exemption**

Subparagraph (A) shall cease to apply with respect to any plan year, effective as of the first day of the plan year, upon payment by the plan sponsor of a contribution (in addition to any minimum required contribution under section 1083 of this title) equal to the amount sufficient to result in an adjusted funding target attainment percentage of 60 percent.

**(5) Rules relating to contributions required to avoid benefit limitations**

**(A) Security may be provided**

**(i) In general**

For purposes of this subsection, the adjusted funding target attainment percentage shall be determined by treating as an asset of the plan any security provided by a plan sponsor in a form meeting the requirements of clause (ii).

**(ii) Form of security**

The security required under clause (i) shall consist of—

---

[1] So in original. Probably should be "purposes".

(I) a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title,

(II) cash, or United States obligations which mature in 3 years or less, held in escrow by a bank or similar financial institution, or

(III) such other form of security as is satisfactory to the Secretary of the Treasury and the parties involved.

**(iii) Enforcement**

Any security provided under clause (i) may be perfected and enforced at any time after the earlier of—

(I) the date on which the plan terminates,

(II) if there is a failure to make a payment of the minimum required contribution for any plan year beginning after the security is provided, the due date for the payment under section 1083(j) of this title, or

(III) if the adjusted funding target attainment percentage is less than 60 percent for a consecutive period of 7 years, the valuation date for the last year in the period.

**(iv) Release of security**

The security shall be released (and any amounts thereunder shall be refunded together with any interest accrued thereon) at such time as the Secretary of the Treasury may prescribe in regulations, including regulations for partial releases of the security by reason of increases in the adjusted funding target attainment percentage.

**(B) Prefunding balance or funding standard carryover balance may not be used**

No prefunding balance or funding standard carryover balance under section 1083(f) of this title may be used under paragraph (1), (2), or (4) to satisfy any payment an employer may make under any such paragraph to avoid or terminate the application of any limitation under such paragraph.

**(C) Deemed reduction of funding balances**

**(i) In general**

Subject to clause (iii), in any case in which a benefit limitation under paragraph (1), (2), (3), or (4) would (but for this subparagraph and determined without regard to paragraph (1)(B), (2)(B), or (4)(B)) apply to such plan for the plan year, the plan sponsor of such plan shall be treated for purposes of this chapter as having made an election under section 1083(f) of this title to reduce the prefunding balance or funding standard carryover balance by such amount as is necessary for such benefit limitation to not apply to the plan for such plan year.

**(ii) Exception for insufficient funding balances**

Clause (i) shall not apply with respect to a benefit limitation for any plan year if the application of clause (i) would not result in the benefit limitation not applying for such plan year.

**(iii) Restrictions of certain rules to collectively bargained plans**

With respect to any benefit limitation under paragraph (1), (2), or (4), clause (i) shall only apply in the case of a plan maintained pursuant to 1 or more collective bargaining agreements between employee representatives and 1 or more employers.

**(6) New plans**

Paragraphs (1), (2), and (4) shall not apply to a plan for the first 5 plan years of the plan. For purposes of this paragraph, the reference in this paragraph to a plan shall include a reference to any predecessor plan.

**(7) Presumed underfunding for purposes of benefit limitations**

**(A) Presumption of continued underfunding**

In any case in which a benefit limitation under paragraph (1), (2), (3), or (4) has been applied to a plan with respect to the plan year preceding the current plan year, the adjusted funding target attainment percentage of the plan for the current plan year shall be presumed to be equal to the adjusted funding target attainment percentage of the plan for the preceding plan year until the enrolled actuary of the plan certifies the actual adjusted funding target attainment percentage of the plan for the current plan year.

**(B) Presumption of underfunding after 10th month**

In any case in which no certification of the adjusted funding target attainment percentage for the current plan year is made with respect to the plan before the first day of the 10th month of such year, for purposes of paragraphs (1), (2), (3), and (4), such first day shall be deemed, for purposes of such paragraph, to be the valuation date of the plan for the current plan year and the plan's adjusted funding target attainment percentage shall be conclusively presumed to be less than 60 percent as of such first day.

**(C) Presumption of underfunding after 4th month for nearly underfunded plans**

In any case in which—

(i) a benefit limitation under paragraph (1), (2), (3), or (4) did not apply to a plan with respect to the plan year preceding the current plan year, but the adjusted funding target attainment percentage of the plan for such preceding plan year was not more than 10 percentage points greater than the percentage which would have caused such paragraph to apply to the plan with respect to such preceding plan year, and

(ii) as of the first day of the 4th month of the current plan year, the enrolled actuary of the plan has not certified the actual adjusted funding target attainment percentage of the plan for the current plan year,

until the enrolled actuary so certifies, such first day shall be deemed, for purposes of

Page 383                    TITLE 29—LABOR                    § 1056

such paragraph, to be the valuation date of the plan for the current plan year and the adjusted funding target attainment percentage of the plan as of such first day shall, for purposes of such paragraph, be presumed to be equal to 10 percentage points less than the adjusted funding target attainment percentage of the plan for such preceding plan year.

**(8) Treatment of plan as of close of prohibited or cessation period**

For purposes of applying this part—

**(A) Operation of plan after period**

Unless the plan provides otherwise, payments and accruals will resume effective as of the day following the close of the period for which any limitation of payment or accrual of benefits under paragraph (3) or (4) applies.

**(B) Treatment of affected benefits**

Nothing in this paragraph shall be construed as affecting the plan's treatment of benefits which would have been paid or accrued but for this subsection.

**(9) Terms relating to funding target attainment percentage**

For purposes of this subsection—

**(A) In general**

The term "funding target attainment percentage" has the same meaning given such term by section 1083(d)(2) of this title.

**(B) Adjusted funding target attainment percentage**

The term "adjusted funding target attainment percentage" means the funding target attainment percentage which is determined under subparagraph (A) by increasing each of the amounts under subparagraphs (A) and (B) of section 1083(d)(2) of this title by the aggregate amount of purchases of annuities for employees other than highly compensated employees (as defined in section 414(q) of title 26) which were made by the plan during the preceding 2 plan years.

**(C) Application to plans which are fully funded without regard to reductions for funding balances**

**(i) In general**

In the case of a plan for any plan year, if the funding target attainment percentage is 100 percent or more (determined without regard to the reduction in the value of assets under section 1083(f)(4) of this title), the funding target attainment percentage for purposes of subparagraphs (A) and (B) shall be determined without regard to such reduction.

**(ii) Transition rule**

Clause (i) shall be applied to plan years beginning after 2007 and before 2011 by substituting for "100 percent" the applicable percentage determined in accordance with the following table:

| In the case of a plan year beginning in calendar year: | The applicable percentage is |
|---|---|

| 2008 | 92 |
| 2009 | 91 |
| 2010 | 96. |

**(iii) Limitation**

Clause (ii) shall not apply with respect to any plan year beginning after 2008 unless the funding target attainment percentage (determined without regard to the reduction in the value of assets under section 1083(f)(4) of this title) of the plan for each preceding plan year beginning after 2007 was not less than the applicable percentage with respect to such preceding plan year determined under clause (ii).

**(D) Special rule for certain years**

Solely for purposes of any applicable provision—

**(i) In general**

For plan years beginning on or after October 1, 2008, and before October 1, 2010, the adjusted funding target attainment percentage of a plan shall be the greater of—

(I) such percentage, as determined without regard to this subparagraph, or

(II) the adjusted funding target attainment percentage for such plan for the plan year beginning after October 1, 2007, and before October 1, 2008, as determined under rules prescribed by the Secretary of the Treasury.

**(ii) Special rule**

In the case of a plan for which the valuation date is not the first day of the plan year—

(I) clause (i) shall apply to plan years beginning after December 31, 2007, and before January 1, 2010, and

(II) clause (i)(II) shall apply based on the last plan year beginning before November 1, 2007, as determined under rules prescribed by the Secretary of the Treasury.

**(iii) Applicable provision**

For purposes of this subparagraph, the term "applicable provision" means—

(I) paragraph (3), but only for purposes of applying such paragraph to a payment which, as determined under rules prescribed by the Secretary of the Treasury, is a payment under a social security leveling option which accelerates payments under the plan before, and reduces payments after, a participant starts receiving social security benefits in order to provide substantially similar aggregate payments both before and after such benefits are received, and

(II) paragraph (4).

**(10) Secretarial authority for plans with alternate valuation date**

In the case of a plan which has designated a valuation date other than the first day of the plan year, the Secretary of the Treasury may prescribe rules for the application of this subsection which are necessary to reflect the alternate valuation date.

**(11) Special rule for 2008**

For purposes of this subsection, in the case of plan years beginning in 2008, the funding

target attainment percentage for the preceding plan year may be determined using such methods of estimation as the Secretary of the Treasury may provide.

(Pub. L. 93–406, title I, § 206, Sept. 2, 1974, 88 Stat. 864; Pub. L. 98–397, title I, § 104(a), Aug. 23, 1984, 98 Stat. 1433; Pub. L. 99–514, title XVIII, § 1898(c)(2)(B), (4)(B), (5), (6)(B), (7)(B), Oct. 22, 1986, 100 Stat. 2952–2954; Pub. L. 101–239, title VII, §§ 7891(a)(1), 7894(c)(8), (9)(A), Dec. 19, 1989, 103 Stat. 2445, 2449; Pub. L. 103–465, title VII, §§ 761(a)(9)(B)(i), 776(c)(2), Dec. 8, 1994, 108 Stat. 5033, 5048; Pub. L. 105–34, title XV, § 1502(a), Aug. 5, 1997, 111 Stat. 1058; Pub. L. 109–280, title I, §§ 103(a), 108(a)(9), (10), formerly § 107(a)(9), (10), title IV, § 410(b), Aug. 17, 2006, 120 Stat. 809, 819, 935, renumbered Pub. L. 111–192, title II, § 202(a), June 25, 2010, 124 Stat. 1297; Pub. L. 110–458, title I, § 101(c)(1)(B)–(G), Dec. 23, 2008, 122 Stat. 5097; Pub. L. 111–192, title II, § 203(a)(1), June 25, 2010, 124 Stat. 1299.)

REFERENCES IN TEXT

The Social Security Act, referred to in subsec. (b), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Title II of the Social Security Act is classified generally to subchapter II (§ 401 et seq.) of chapter 7 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

The Railroad Retirement Act of 1937, referred to in subsec. (b), is act Aug. 29, 1935, ch. 812, 49 Stat. 967, as amended generally by act June 24, 1937, ch. 382, part I, 50 Stat. 307, and which was classified principally to subchapter III (§ 228a et seq.) of chapter 9 of Title 45, Railroads. The Railroad Retirement Act of 1937 was amended generally and redesignated the Railroad Retirement Act of 1974 by Pub. L. 93–445, title I, Oct. 16, 1974, 88 Stat. 1305. The Railroad Retirement Act of 1974 is classified generally to subchapter IV (§ 231 et seq.) of chapter 9 of Title 45. For complete classification of these acts to the Code, see Tables.

This chapter, referred to in subsecs. (e)(4) and (g)(5)(C)(i), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974, Titles I, III, and IV of such Act, are classified principally to this chapter. For complete classification of Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

AMENDMENTS

2010—Subsec. (g)(9)(D). Pub. L. 111–192, § 203(a)(1), added subpar. (D).

2008—Subsec. (g)(1)(B)(ii). Pub. L. 110–458, § 101(c)(1)(B), substituted "an adjusted funding" for "a funding".

Subsec. (g)(1)(C). Pub. L. 110–458, § 101(c)(1)(C), inserted "benefit" after "event" in heading.

Subsec. (g)(3)(E). Pub. L. 110–458, § 101(c)(1)(D), inserted concluding provisions.

Subsec. (g)(5)(A)(iv). Pub. L. 110–458, § 101(c)(1)(E), inserted "adjusted" before "funding".

Subsec. (g)(9)(C). Pub. L. 110–458, § 101(c)(1)(F), in cl. (i), struck out "without regard to this subparagraph and" before "without regard to the reduction" and, in cl. (iii), substituted "without regard to the reduction in the value of assets under section 1083(f)(4) of this title" for "without regard to this subparagraph" and inserted "beginning" before "after" in two places.

Subsec. (g)(10), (11). Pub. L. 110–458, § 101(c)(1)(G), added par. (10) and redesignated former par. (10) as (11).

2006—Subsec. (e)(1). Pub. L. 109–280, § 108(a)(9), formerly § 107(a)(9), as renumbered by Pub. L. 111–192, § 202(a), substituted "1083(j)(4)" for "1082(d)" and "1083(j)(4)(E)(i)" for "1082(e)(5)".

Subsec. (e)(3). Pub. L. 109–280, § 108(a)(10), formerly § 107(a)(10), as renumbered by Pub. L. 111–192, § 202(a).

substituted "section 1083(j)(3) of this title by reason of section 1083(j)(4)(A) of this title" for "section 1082(e) of this title by reason of paragraph (5)(A) thereof".

Subsec. (f). Pub. L. 109–280, § 410(b), substituted "section 1350 of this title" for "subchapter III of this chapter, the plan shall provide that".

Subsec. (g). Pub. L. 109–280, § 103(a), added subsec. (g).

1997—Subsec. (d)(4), (5). Pub. L. 105–34 added pars. (4) and (5).

1994—Subsec. (e). Pub. L. 103–465, § 761(a)(9)(B)(i), added subsec. (e).

Subsec. (f). Pub. L. 103–465, § 776(c)(2), added subsec. (f).

1989—Subsec. (a)(1). Pub. L. 101–239, § 7894(c)(8), inserted "occurs" before "the date".

Subsec. (d)(2). Pub. L. 101–239, § 7891(a)(1), substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Subsec. (d)(3)(I). Pub. L. 101–239, § 7894(c)(9)(A), substituted "such Act" for "such act".

1986—Subsec. (d)(3)(E)(i). Pub. L. 99–514, § 1898(c)(7)(B)(iii), substituted "A" for "In the case of any payment before a participant has separated from service, a" in introductory provisions and inserted "in the case of any payment before a participant has separated from service," in subcl. (I).

Subsec. (d)(3)(E)(ii). Pub. L. 99–514, § 1898(c)(7)(B)(iv), amended cl. (ii) generally. Prior to amendment, cl. (ii) read as follows: "For purposes of this subparagraph, the term 'earliest retirement age' has the meaning given such term by section 1053(b)(3) of this section, except that in the case of any individual account plan, the earliest retirement age shall be the date which is 10 years before the normal retirement age."

Subsec. (d)(3)(F)(i). Pub. L. 99–514, § 1898(c)(6)(B), inserted "(and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)".

Subsec. (d)(3)(F)(ii). Pub. L. 99–514, § 1898(c)(7)(B)(i), inserted "surviving" before "former spouse".

Subsec. (d)(3)(G)(i)(I). Pub. L. 99–514, § 1898(c)(7)(B)(ii), substituted "each" for "any other".

Subsec. (d)(3)(H)(i). Pub. L. 99–514, § 1898(c)(2)(B)(i), substituted "shall separately account for the amounts (hereinafter in this subparagraph referred to as the 'segregated amounts')" for "shall segregate in a separate account in the plan or in an escrow account the amounts".

Subsec. (d)(3)(H)(ii), (iii). Pub. L. 99–514, § 1898(c)(2)(B)(ii), (iii), substituted "the 18-month period described in clause (v)" for "18 months" and "including any interest" for "plus any interest".

Subsec. (d)(3)(H)(iv). Pub. L. 99–514, § 1898(c)(2)(B)(iv), inserted "described in clause (v)".

Subsec. (d)(3)(H)(v). Pub. L. 99–514, § 1898(c)(2)(B)(v), added cl. (v).

Subsec. (d)(3)(L). Pub. L. 99–514, § 1898(c)(4)(B), added subpar. (L) and redesignated former subpar. (L) as (N).

Subsec. (d)(3)(M). Pub. L. 99–514, § 1898(c)(5), added subpar. (M).

Subsec. (d)(3)(N). Pub. L. 99–514, § 1898(c)(4)(B), redesignated subpar. (L) as (N).

1984—Subsec. (d)(3). Pub. L. 98–397 added par. (3).

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–458 effective as if included in the provisions of Pub. L. 109–280 to which the amendment relates, except as otherwise provided, see section 112 of Pub. L. 110–458, set out as a note under section 72 of Title 26, Internal Revenue Code.

EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 103(a) of Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2007, with collective bargaining exception, see section 103(c) of Pub. L. 109–280, set out as a note under section 1021 of this title.

Amendment by section 108(a)(9), (10) of Pub. L. 109–280 applicable to plan years beginning after 2007, see section 108(e) of Pub. L. 109–280, set out as a note under section 1021 of this title.

Pub. L. 109–280, title IV, §410(c), Aug. 17, 2006, 120 Stat. 935, provided that: "The amendments made by this section [amending this section and section 1350 of this title] shall apply to distributions made after final regulations implementing subsections (c) and (d) of section 4050 of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1350(c), (d)] (as added by subsection (a)), respectively, are prescribed."

#### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–34 applicable to judgments, orders, and decrees issued, and settlement agreements entered into, on or after Aug. 5, 1997, see section 1502(c) of Pub. L. 105–34, set out as a note under section 401 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1994 AMENDMENT

Pub. L. 103–465, title VII, §761(b), Dec. 8, 1994, 108 Stat. 5034, provided that:

"(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section [amending this section and sections 1082, 1132, and 1301 of this title] shall apply to plan years beginning after December 31, 1994.

"(2) CONTRIBUTING SPONSOR.—The amendment made by subsection (a)(11) [amending section 1301 of this title] shall be effective as if included in the Pension Protection Act [Pub. L. 100–203, title IX, subtitle D, part II, §§9302–9346]."

Pub. L. 103–465, title VII, §776(e), Dec. 8, 1994, 108 Stat. 5048, provided that: "The provisions of this section [enacting section 1350 of this title and amending this section and sections 1303, 1305, and 1341 of this title and section 401 of Title 26, Internal Revenue Code] shall be effective with respect to distributions that occur in plan years commencing after final regulations implementing these provisions are prescribed by the Pension Benefit Guaranty Corporation." [Final implementing regulations were issued Nov. 22, 1995, effective for distributions in plan years beginning on or after Jan. 1, 1996. See 60 F.R. 61740.]

#### EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by section 7891(a)(1) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 7891(f) of Pub. L. 101–239, set out as a note under section 1002 of this title.

Amendment by section 7894(c)(8) of Pub. L. 101–239 effective, except as otherwise provided, as if originally included in the provision of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, to which such amendment relates. see section 7894(i) of Pub. L. 101–239, set out as a note under section 1002 of this title.

Pub. L. 101–239, title VII, §7894(c)(9)(B), Dec. 19, 1989, 103 Stat. 2449, provided that: "The amendment made by subparagraph (A) [amending this section] shall take effect as if included in section 104 of the Retirement Equity Act of 1984 [Pub. L. 98–397]."

#### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–514 effective as if included in the provision of the Retirement Equity Act of 1984, Pub. L. 98–397, to which such amendment relates, except as otherwise provided, see section 1898(j) of Pub. L. 99–514, set out as a note under section 401 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–397 effective Jan. 1, 1985, except as otherwise provided, see section 303(d) of Pub. L. 98–397, set out as a note under section 1001 of this title.

#### APPLICABILITY OF AMENDMENTS BY SUBTITLES A AND B OF TITLE I OF PUB. L. 109–280

For special rules on applicability of amendments by subtitles A (§§101–108) and B (§§111–116) of title I of Pub. L. 109–280 to certain eligible cooperative plans, PBGC settlement plans, and eligible government contractor plans, see sections 104, 105, and 106 of Pub. L. 109–280, set out as notes under section 401 of Title 26, Internal Revenue Code.

#### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, set out as a note under section 401 of Title 26, Internal Revenue Code.

### §1057. Repealed. Pub. L. 109–280, title I, §108(d), formerly §107(d), Aug. 17, 2006, 120 Stat. 820, renumbered Pub. L. 111–192, title II, §202(a), June 25, 2010, 124 Stat. 1297

Section, Pub. L. 93–406, title I, §207, Sept. 2, 1974, 88 Stat. 865, related to temporary variances from certain vesting requirements.

#### EFFECTIVE DATE OF REPEAL

Repeal applicable to plan years beginning after 2007, see section 108(e) of Pub. L. 109–280, set out as an Effective Date of 2006 Amendment note under section 1021 of this title.

### §1058. Mergers and consolidations of plans or transfers of plan assets

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated). The preceding sentence shall not apply to any transaction to the extent that participants either before or after the transaction are covered under a multiemployer plan to which subchapter III of this chapter applies.

(Pub. L. 93–406, title I, §208, Sept. 2, 1974, 88 Stat. 865; Pub. L. 96–364, title IV, §402(b)(1), Sept. 26, 1980, 94 Stat. 1299.)

#### AMENDMENTS

1980—Pub. L. 96–364 substituted provisions respecting applicability of preceding sentence to transactions under a covered multiemployer plan to which subchapter III applies, for provisions relating to applicability of paragraph to a multiemployer plan only to extent determined by Corporation.

#### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–364 effective Sept. 26, 1980, except as specifically provided, see section 1461(e) of this title.

### §1059. Recordkeeping and reporting requirements

(a)(1) Except as provided by paragraph (2) every employer shall, in accordance with such

Westlaw.

26 C.F.R. § 601.601                                                        Page 1

Treas. Reg. § 601.601

**C**

         **Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter H. Internal Revenue Practice
        Part 601. Statement of Procedural Rules (Refs & Annos)
          Subpart F. Rules, Regulations, and Forms
        ➡ **§ 601.601 Rules and regulations.**

**(a) Formulation. (1)** Internal revenue rules take various forms. The most important rules are issued as regulations and Treasury decisions prescribed by the Commissioner and approved by the Secretary or his delegate. Other rules may be issued over the signature of the Commissioner or the signature of any other official to whom authority has been delegated. Regulations and Treasury decisions are prepared in the Office of the Chief Counsel. After approval by the Commissioner, regulations and Treasury decisions are forwarded to the Secretary or his delegate for further consideration and final approval.

**(2)** Where required by 5 U.S.C. 553 and in such other instances as may be desirable, the Commissioner publishes in the Federal Register general notice of proposed rules (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law). This notice includes:

**(i)** A statement of the time, place, and nature of public rulemaking proceedings;

**(ii)** Reference to the authority under which the rule is proposed;

**(iii)** Either the terms or substance of the proposed rule or a description of the subjects and issues involved.

**(3)(i)** This subparagraph shall apply where the rules of this subparagraph are incorporated by reference in a notice of hearing with respect to a notice of proposed rule making.

**(ii)** A person wishing to make oral comments at a public hearing to which this subparagraph applies shall file his written comments within the time prescribed by the notice of proposed rule making (including any extensions thereof) and submit the outline referred to in subdivision (iii) of this subparagraph within the time prescribed by the notice of hearing. In lieu of the reading of a prepared statement at the hearing, such person's oral comments shall ordinarily be limited to a discussion of matters relating to such written comments and to questions and answers in connection therewith. However, the oral comments shall not be merely a restatement of matters the person has submitted in writing. Persons making oral comments should be prepared to answer questions not only on the topics listed in his outline but also in connection with the matters relating to his written comments. Except as provided in paragraph (b) of this section, in order to be assured of the availability of copies of such written comments or outlines on or before the beginning of such hearing, any person who desires such copies should make such a request within the time prescribed in the notice of hearing and shall agree to pay reasonable costs for copying. Persons who make such a request after the time prescribed in the notice of hearing will be furnished copies

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

S. Add. 12

26 C.F.R. § 601.601                                                              Page 2

Treas. Reg. § 601.601

as soon as they are available, but it may not be possible to furnish the copies on or before the beginning of the hearing. Except as provided in the preceding sentences, copies of written comments regarding the rules proposed shall not be made available at the hearing.

(iii) A person who wishes to be assured of being heard shall submit, within the time prescribed in the notice of hearing, an outline of the topics he or she wishes to discuss, and the time he or she wishes to devote to each topic. An agenda will then be prepared containing the order of presentation of oral comments and the time allotted to such presentation. A period of 10 minutes will be the time allotted to each person for making his or her oral comments.

(iv) At the conclusion of the presentations of comments of persons listed in the agenda, to the extent time permits, other persons may be permitted to present oral comments provided they have notified, either the Commissioner of Internal Revenue (Attention: CC:LR:T) before the hearing, or the representative of the Internal Revenue Service stationed at the entrance to the hearing room at or before commencement of the hearing, of their desire to be heard.

(v) In the case of unusual circumstances or for good cause shown, the application of rules contained in this subparagraph, including the 10–minute rule in subdivision (iii), above, may be waived.

(vi) To the extent resources permit, the public hearings to which this subparagraph applies may be transcribed.

(b) Comments on proposed rules--(1) In general. Interested persons are privileged to submit any

data, views, or arguments in response to a notice of proposed rule making published pursuant to 5 U.S.C. 553. Further, procedures are provided in paragraph (d)(9) of § 601.702 for members of the public to inspect and to obtain copies of written comments submitted in response to such notices. Designations of material as confidential or not to be disclosed, contained in such comments, will not be accepted. Thus, a person submitting written comments in response to a notice of proposed rule making should not include therein material that he considers to be confidential or inappropriate for disclosure to the public. It will be presumed by the Internal Revenue Service that every written comment submitted to it in response to a notice of proposed rule making is intended by the person submitting it to be subject in its entirety to public inspection and copying in accordance with the procedures of paragraph (d)(9) of § 601.702. The name of any person requesting a public hearing and hearing outlines described in paragraph (a)(3)(iii) of this section are not exempt from disclosure.

(2) Effective date. This paragraph (b) applies only to comments submitted in response to notices of proposed rule making of the Internal Revenue Service published in the Federal Register after June 5, 1974.

(c) Petition to change rules. Interested persons are privileged to petition for the issuance, amendment, or repeal of a rule. A petition for the issuance of a rule should identify the section or sections of law involved; and a petition for the amendment or repeal of a rule should set forth the section or sections of the regulations involved. The petition should also set forth the reasons for the requested action. Such petitions will be given careful consideration and the petitioner will be advised of the action taken thereon. Petitions should be addressed to the Commissioner of Internal Revenue, Attention: CC:LR:T, Washington, DC 20224. However, in the case of petitions to amend the regulations pursuant to subsection

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

S. Add. 13

26 C.F.R. § 601.601

Page 3

Treas. Reg. § 601.601

(c)(4)(A)(viii) or (5)(A)(i) of section 23 or former section 44C, follow the procedure outlined in paragraph (a) of § 1.23–6.

**(d) Publication of rules and regulations--(1) General.** All Internal Revenue Regulations and Treasury decisions are published in the Federal Register and in the Code of Federal Regulations. See paragraph (a) of § 601.702. The Treasury decisions are also published in the weekly Internal Revenue Bulletin and the semiannual Cumulative Bulletin. The Internal Revenue Bulletin is the authoritative instrument of the Commissioner for the announcement of official rulings, decisions, opinions, and procedures, and for the publication of Treasury decisions, Executive orders, tax conventions, legislation, court decisions, and other items pertaining to internal revenue matters. It is the policy of the Internal Revenue Service to publish in the Bulletin all substantive and procedural rulings of importance or general interest, the publication of which is considered necessary to promote a uniform application of the laws administered by the Service. Procedures set forth in Revenue Procedures published in the Bulletin which are of general applicability and which have continuing force and effect are incorporated as amendments to the Statement of Procedural Rules. It is also the policy to publish in the Bulletin all rulings which revoke, modify, amend, or affect any published ruling. Rules relating solely to matters of internal practices and procedures are not published; however, statements of internal practices and procedures affecting rights or duties of taxpayers, or industry regulation, which appear in internal management documents, are published in the Bulletin. No unpublished ruling or decision will be relied on, used, or cited by any officer or employee of the Internal Revenue Service as a precedent in the disposition of other cases.

**(2) Objectives and standards for publication of Revenue Rulings and Revenue Procedures in the Internal Revenue Bulletin--(i)(a)** A

Revenue Ruling is an official interpretation by the Service that has been published in the Internal Revenue Bulletin. Revenue Rulings are issued only by the National Office and are published for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned.

(b) A Revenue Procedure is a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge.

(ii)(a) The Internal Revenue Bulletin is the authoritative instrument of the Commissioner of Internal Revenue for the publication of official rulings and procedures of the Internal Revenue Service, including all rulings and statements of procedure which supersede, revoke, modify, amend, or affect any previously published ruling or procedure. The Service also announces in the Bulletin the Commissioner's acquiescences and nonacquiescences in decisions of the U.S. Tax Court (other than decisions in memorandum opinions), and publishes Treasury decisions, Executive orders, tax conventions, legislation, court decisions, and other items considered to be of general interest. The Assistant Commissioner (Technical) administers the Bulletin program.

(b) The Bulletin is published weekly. In order to provide a permanent reference source, the contents of the Bulletin are consolidated semiannually into an indexed Cumulative Bulletin. The Bulletin Index–Digest System provides a research and reference guide to matters appearing in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

S. Add. 14

26 C.F.R. § 601.601                                                Page 4

Treas. Reg. § 601.601

the Cumulative Bulletins. These materials are sold by the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.

**(iii)** The purpose of publishing revenue rulings and revenue procedures in the Internal Revenue Bulletin is to promote correct and uniform application of the tax laws by Internal Revenue Service employees and to assist taxpayers in attaining maximum voluntary compliance by informing Service personnel and the public of National Office interpretations of the internal revenue laws, related statutes, treaties, regulations, and statements of Service procedures affecting the rights and duties of taxpayers. Therefore, issues and answers involving substantive tax law under the jurisdiction of the Internal Revenue Service will be published in the Internal Revenue Bulletin, except those involving:

(a) Issues answered by statute, treaty, or regulations;

(b) Issues answered by rulings, opinions, or court decisions previously published in the Bulletin;

(c) Issues that are of insufficient importance or interest to warrant publication;

(d) Determinations of fact rather than interpretations of law;

(e) Informers and informers' rewards; or

(f) Disclosure of secret formulas, processes, business practices, and similar information.

Procedures affecting taxpayers' rights or duties that relate to matters under the jurisdiction of the Service will be published in the Bulletin.

**(iv)** [Reserved]

**(v)(a)** Rulings and other communications involving substantive tax law published in the Bulletin are published in the form of Revenue Rulings. The conclusions expressed in Revenue Rulings will be directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling. Revenue Rulings arise from various sources, including rulings to taxpayers, technical advice to district offices, studies undertaken by the Office of the Assistant Commissioner (Technical), court decisions, suggestions from tax practitioner groups, publications, etc.

(b) It will be the practice of the Service to publish as much of the ruling or communication as is necessary for an understanding of the position stated. However, in order to prevent unwarranted invasions of personal privacy and to comply with statutory provisions, such as 18 U.S.C. 1905 and 26 U.S.C. 7213, dealing with disclosure of information obtained from members of the public, identifying details, including the names and addresses of persons involved, and information of a confidential nature are deleted from the ruling.

(c) Revenue Rulings, other than those relating to the qualification of pension, annuity, profit-sharing, stock bonus, and bond purchase plans, apply retroactively unless the Revenue Ruling includes a specific statement indicating, under the authority of section 7805(b) of the Internal Revenue Code of 1954, the extent to which

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

S. Add. 15

26 C.F.R. § 601.601                                                    Page 5

Treas. Reg. § 601.601

it is to be applied without retroactive effect. Where Revenue Rulings revoke or modify rulings previously published in the Bulletin the authority of section 7805(b) of the Code ordinarily is invoked to provide that the new rulings will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers. Section 7805(b) of the Code provides that the Secretary of the Treasury or his delegate may prescribe the extent to which any ruling is to be applied without retroactive effect. The exercise of this authority requires an affirmative action. For the effect of Revenue Rulings on determination letters and opinion letters issued with respect to the qualification of pension, annuity, profit-sharing, stock bonus, and bond purchase plans, see paragraph (o) of § 601.201.

(d) Revenue Rulings published in the Bulletin do not have the force and effect of Treasury Department Regulations (including Treasury decisions), but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose. No unpublished ruling or decision will be relied on, used, or cited, by any officer or employee of the Service as a precedent in the disposition of other cases.

(e) Taxpayers generally may rely upon Revenue Rulings published in the Bulletin in determining the tax treatment of their own transactions and need not request specific rulings applying the principles of a published Revenue Ruling to the facts of their particular cases. However, since each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others

concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same. They should consider the effect of subsequent legislation, regulations, court decisions, and revenue rulings.

(f) Comments and suggestions from taxpayers or taxpayer groups on Revenue Rulings being prepared for publication in the Bulletin may be solicited, if justified by special circumstances. Conferences on Revenue Rulings being prepared for publication will not be granted except where the Service determines that such action is justified by special circumstances.

(vi) Statements of procedures which affect the rights or duties of taxpayers or other members of the public under the Code and related statutes will be published in the Bulletin in the form of Revenue Procedures. Revenue Procedures usually reflect the contents of internal management documents, but, where appropriate, they are also published to announce practices and procedures for guidance of the public. It is Service practice to publish as much of the internal management document or communication as is necessary for an understanding of the procedure. Revenue Procedures may also be based on internal management documents which should be a matter of public knowledge even though not necessarily affecting the rights or duties of the public. When publication of the substance of a Revenue Procedure in the Federal Register is required pursuant to 5 U.S.C. 552, it will usually be accomplished by an amendment of the Statement of procedural Rules (26 CFR Part 601).

(vii)(a)    The    Assistant    Commissioner

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.
S. Add. 16

26 C.F.R. § 601.601                                                    Page 6

Treas. Reg. § 601.601

(Technical) is responsible for administering the system for the publication of Revenue Rulings and Revenue Procedures in the Bulletin, including the standards for style and format.

(b) In accordance with the standards set forth in subdivision (iv) of this subparagraph, each Assistant Commissioner is responsible for the preparation and appropriate referral for publication of Revenue Rulings reflecting interpretations of substantive tax law made by his office and communicated in writing to taxpayers or field offices. In this connection, the Chief Counsel is responsible for the referral to the appropriate Assistant Commissioner, for consideration for publication as Revenue Rulings, of interpretations of substantive tax law made by his Office.

(c) In accordance with the standards set forth in subdivision (iv) of this subparagraph, each Assistant Commissioner and the Chief Counsel is responsible for determining whether procedures established by any office under his jurisdiction should be published as Revenue Procedures and for the initiation, content, and appropriate referral for publication of such Revenue Procedures.

(e) Foreign tax law. (1) The Service will accept the interpretation placed by a foreign tax convention country on its revenue laws which do not affect the tax convention. However, when such interpretation conflicts with a provision in the tax convention, reconsideration of that interpretation may be requested.

(2) Conferences in the National Office of the Service will be granted to representatives of American firms doing business abroad and of

American citizens residing abroad, in order to discuss with them foreign tax matters with respect to those countries with which we have tax treaties in effect.

[32 FR 15990, Nov. 22, 1967, as amended by 33 FR 6826, May 4, 1968; 35 FR 16593, Oct. 24, 1970; 38 FR 4971, Feb. 23, 1973; 38 FR 8246, March 30, 1973; 38 FR 8448, April 2, 1973; 39 FR 15755, May 6, 1974; 41 FR 13611, March 31, 1976; 41 FR 20883, May 21, 1976; 43 FR 17821, April 26, 1978; T.D. 7861, 47 FR 56333, Dec. 16, 1982; 48 FR 15624, April 12, 1983; T.D. 8146, 52 FR 26673, July 16, 1987]

SOURCE: 32 FR 15990, Nov. 22, 1967, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301 and 552.; Subpart I also issued under 39 U.S.C. 3220.

Treas. Reg. § 601.601, 26 C.F.R. § 601.601

Current through January 9, 2014; 79 FR 1606

© 2013 Thomson Reuters.
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rev. Proc. 92-65, 1992-2 CB 428, 08/17/1992, IRC Sec(s). 451

## IRS SPECIFIES CONDITIONS FOR ADVANCE RULINGS ON UNFUNDED DEFERRED COMPENSATION ARRANGEMENTS.

### Headnote:

**Rev. Proc. 92-65, 1992-33 I.R.B. 16, 8/17/92**

*Reference(s):* Code Sec. 451;

The Service in Revenue Procedure 92-65 has set forth the circumstances in which it will issue advance rulings concerning the application of the constructive-receipt doctrine to unfunded deferred compensation arrangements. Rev. Proc. 92-65, which is effective as of July 28, 1992, amplifies Rev. Proc. 71-19, 1971-1 C.B. 698.

The Service says that in each request for a ruling involving the deferral of compensation, it will determine whether the constructive-receipt doctrine is applicable on a case-by-case basis. It will ordinarily issue rulings regarding unfunded deferred compensation arrangements only if the requirements of Rev. Proc. 71-19 are met and the arrangement complies with the guidelines specified in section 3 of Rev. Proc. 92-65. One of those guidelines specifies that if a plan refers to a trust, the plan must also provide that any trust created by the employer and any assets held by the trust to assist it in meeting its obligations under the plan will conform to the terms of the model rabbi trust described in Rev. Proc. 92-64.

The general procedures of Rev. Proc. 92-1, 1992-1 I.R.B. 9, on the issuance of ruling and determination letters, and Rev. Proc. 71-19 continue to apply to requests relating to unfunded deferred compensation arrangements to the extent they are not covered by Rev. Proc. 92-65.

### Full Text:

PART III.

Administrative, Procedural, and Miscellaneous

26 CFR 601.201: Rulings and determination letters.

S. Add. 18

(Also Part I, Sections 404, 451; 1.404(a)-12, 1.451-1)

# 1. PURPOSE

.01. The purpose of the Revenue Procedure is to set forth the conditions, or circumstances, under which the Internal Revenue Service will issue advance rulings concerning the application of the doctrine of constructive receipt to unfunded deferred compensation arrangements and to amplify Rev. Proc. 71-19, 1971-1 C.B. 698.

# 2. BACKGROUND

In 1960, the Service issued Rev. Rul 60-31, 1960-1 C.B. 174, concerning the application of the doctrine of constructive receipt to certain deferred compensation arrangements. Rev. Rul. 60-31, was modified by Rev. Rul. 64-279, 1964-2 C.B. 121, and Rev. Rul. 70-435, 1970-2 C.B. 100. The conditions under which the Service would issue advance rulings on unfunded deferred compensation arrangements, were originally published in Rev. Proc. 71-19, 1971-1 C.B. 698.

# 3. SCOPE AND OBJECTIVE

.01. In each request for a ruling involving the deferral of compensation, the Service will determine whether the doctrine of constructive receipt is applicable on a case by case basis. The Service will ordinarily issue rulings regarding unfunded deferred compensation arrangements only if the requirements of Rev. Proc. 71-19 are met and, in addition, the arrangement meets the following guidelines.

(a) Section 3.01 of Rev. Proc. 71-19 states that, if the plan provides for an election to defer payment of compensation, such election must be made before the beginning of the period of service for which the compensation is payable, regardless of the existence in the plan of forfeiture provisions. The period of service for purposes of this requirement generally has been regarded by the Service as the employee's taxable year for cash basis, calendar year taxpayers. Rev. Rul. 68-86, 1968-1 C.B. 184; Rev. Rul. 69-650, 1969-2 C.B. 106; Rev. Rul. 71-419, 1971-2 C.B.

S. Add. 19

220. The Service will issue advance rulings under are two exceptions to this general requirement, as follows:

- (1) In the year in which the plan is first implemented, the eligible participant may make an election to defer compensation for services to be performed subsequent to the election within 30 days after the date the plan is effective for eligible employees.

  - (2) In the first year in which a participant becomes eligible to participate in the plan, the newly eligible participant may make an election to defer compensation for services to be performed subsequent to the election within 30 days after the date the employee becomes eligible.

(b) The plan must define the time and method for payment of deferred compensation for each event (such as termination of employment, regular retirement, disability retirement or death) that entitles a participant to receive benefits. The plan may specify the date of payment or provide that payments will begin within 30 days after the occurrence of a stated event.

(c) The plan may provide for payment of benefits in the case of an "unforeseeable emergency." "Unforeseeable emergency" must be defined in the plan as an unanticipated emergency that is caused by an event beyond the control of the participant or beneficiary and that would result in severe financial hardship to the individual if early withdrawal were not permitted. The plan must further provide that any early withdrawal approved by the employer is limited to the amount necessary to meet the emergency. Language similar to that described in section 1.457-2(h)(4) and (5) of the Income Tax Regulations may be used.

(d) The plan must provide that participants have the status of general unsecured creditors of the employer and that the plan constitutes a mere promise by the employer to make benefit payments in the future. If the plan refers to a trust, the plan must also provide that any trust created by the employer and any assets held by the trust to assist it in meeting its obligations under the plan will conform to the terms of the model trust, as described in Revenue Procedure 92-64, page 11, of this Bulletin. Finally, the plan must state that it is the intention of the parties that the arrangements be unfunded for tax purposes and for purposes of Title I of ERISA.

(e) The plan must provide that a participant's rights to benefit payments under the plan are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, or garnishment by creditors of the participant or the participant's beneficiary.

S. Add. 20

## 4. PROCEDURE

The general procedures of Rev. Proc. 92-1, 1992-1 I.R.B. 9, relating to the issuance of ruling and determination letters, and Rev. Proc. 71-19, 1971-1 C.B. 698, apply to requests relating to unfunded deferred compensation arrangements to the extent they are not covered by this revenue procedure.

## 5. EFFECT ON OTHER REVENUE PROCEDURES

Rev. Proc. 71-19, 1971-1 C.B. 698, is hereby amplified to set forth the conditions under which the Service will issue advance rulings on unfunded deferred compensation plans.

## 6. EFFECTIVE DATE

The revenue procedure is effective on July 28, 1992.

## DRAFTING INFORMATION

The principal author of this revenue procedure is Catherine Livingston Fernandez of the Office of the Assistant Chief Counsel, (Employee Benefits and Exempt Organizations). For further information regarding this revenue procedure contact Ms. Fernandez at (202) 622-6030 (not a toll-free call).

© 2014 Thomson Reuters/Tax & Accounting. All Rights Reserved. | Privacy Statement

S. Add. 21

CIVIL PROCEDURE — CIRCUIT COURT   **Rule 2-645**

quires. Fowler v. Fitzgerald, 82 Md. App. 166, 570 A.2d 866 (1990).

In determining auctioneers' fees, the court may not defer to a policy established by the sheriff based on a fixed percentage of the sales price when that policy results in a fee that is unwarranted in the particular circumstances; it must, in each case, examine the work done and the contribution actually made by the auctioneer in light of the price received and approve a fee that fairly compensates, but does not overcompensate, the auctioneer for his or her services. Fowler v. Fitzgerald, 82 Md. App. 166, 570 A.2d 866 (1990).

**Cited** in Griffin v. Shapiro, 158 Md. App. 337, 857 A.2d 519, 2004 Md. App. LEXIS 126 (2004), cert. denied, 384 Md. 449, 863 A.2d 998 (2004); D'Aoust v. Diamond, 424 Md. 549, 36 A.3d 941, 2012 Md. LEXIS 67 (2012).

## Rule 2-645. Garnishment of property — Generally.

(a) **Availability.** Subject to the provisions of Rule 2-645.1, this Rule governs garnishment of any property of the judgment debtor, other than wages subject to Rule 2-646 and a partnership interest subject to a charging order, in the hands of a third person for the purpose of satisfying a money judgment. Property includes any debt owed to the judgment debtor, whether immediately payable or unmatured.

(b) **Issuance of writ.** The judgment creditor may obtain issuance of a writ of garnishment by filing in the same action in which the judgment was entered a request that contains (1) the caption of the action, (2) the amount owed under the judgment, (3) the name and last known address of each judgment debtor with respect to whom a writ is requested, and (4) the name and address of the garnishee. Upon the filing of the request, the clerk shall issue a writ of garnishment directed to the garnishee.

(c) **Content.** The writ of garnishment shall:

(1) contain the information in the request, the name and address of the person requesting the writ, and the date of issue,

(2) direct the garnishee to hold, subject to further proceedings, the property of each judgment debtor in the possession of the garnishee at the time of service of the writ and all property of each debtor that may come into the garnishee's possession after service of the writ,

(3) notify the garnishee of the time within which the answer must be filed and that the failure to do so may result in judgment by default against the garnishee,

(4) notify the judgment debtor and garnishee that federal and state exemptions may be available,

(5) notify the judgment debtor of the right to contest the garnishment by filing a motion asserting a defense or objection.

**Committee note.** — A writ of garnishment may direct a garnishee to hold the property of more than one judgment debtor if the name and address of each judgment debtor whose property is sought to be attached is stated in the writ.

(d) **Service.** The writ shall be served on the garnishee in the manner provided by Chapter 100 of this Title for service of process to obtain personal jurisdiction and may be served in or outside the county. Promptly after service upon the garnishee, the person making service shall mail a copy of the writ to the judgment debtor's last known address. Proof of service and mailing shall be filed as provided in Rule 2-126. Subsequent pleadings and papers shall be

Add. 22

**Rule 2-645**        MARYLAND RULES

served on the creditor, debtor, and garnishee in the manner provided by Rule 1-321.

(e) **Answer of garnishee.** The garnishee shall file an answer within the time provided by Rule 2-321. The answer shall admit or deny that the garnishee is indebted to the judgment debtor or has possession of property of the judgment debtor and shall specify the amount and nature of any debt and describe any property. The garnishee may assert any defense that the garnishee may have to the garnishment, as well as any defense that the judgment debtor could assert. After answering, the garnishee may pay any garnished indebtedness into court and may deliver to the sheriff any garnished property, which shall then be treated as if levied upon by the sheriff. A garnishee who has filed an answer admitting indebtedness to the judgment debtor or possession of property of the judgment debtor is not required to file an amended answer solely because of an increase in the garnishee's indebtedness to the judgment debtor or the garnishee's receipt of additional property of the debtor.

(f) **When no answer filed.** If the garnishee fails to file a timely answer, the judgment creditor may proceed pursuant to Rule 2-613 for a judgment by default against the garnishee.

(g) **When answer filed.** If the garnishee files a timely answer, the matters set forth in the answer shall be treated as established for the purpose of the garnishment proceeding unless the judgment creditor files a reply contesting the answer within 30 days after its service. If a timely reply is not filed, the court may enter judgment upon request of the judgment creditor, the judgment debtor, or the garnishee. If a timely reply is filed to the answer of the garnishee, the matter shall proceed as if it were an original action between the judgment creditor as plaintiff and the garnishee as defendant and shall be governed by the rules applicable to civil actions.

(h) **Interrogatories to garnishee.** The judgment creditor may serve interrogatories directed to the garnishee pursuant to Rule 2-421. The interrogatories shall contain a notice to the garnishee that, unless answers are served within 30 days after service of the interrogatories or within the time for filing an answer to the writ, whichever is later, the garnishee may be held in contempt of court. The interrogatories shall also inform the garnishee that the garnishee must file a notice with the court pursuant to Rule 2-401 (d) at the time the answers are served. If the garnishee fails to serve timely answers to interrogatories, the court, upon petition of the judgment creditor and proof of service of the interrogatories, may enter an order in compliance with Rule 15-206 treating the failure to answer as a contempt and may require the garnishee to pay reasonable attorney's fees and costs.

(i) **Release of property; claim by third person.** Before entry of judgment, the judgment debtor may seek release of the garnished property in accordance with Rule 2-643, except that a motion under Rule 2-643 (d) shall be filed within 30 days after service of the writ of garnishment on the garnishee. Before entry of judgment, a third person claimant of the garnished property may proceed in accordance with Rule 2-643 (e).

(j) **Judgment.** The judgment against the garnishee shall be for the amount admitted plus any amount that has come into the hands of the garnishee after

S. Add. 23
568

service of the writ and before the judgment is entered, but not to exceed the amount owed under the creditor's judgment against the debtor and enforcement costs.

(k) **Termination of writ.** Upon entry of a judgment against the garnishee pursuant to section (j) of this Rule, the writ of garnishment and the lien created by the writ shall terminate and the garnishee shall be under no obligation to hold any additional property of the debtor that may come into its possession after the judgment was entered.

(l) **Statement of satisfaction.** Upon satisfaction by the garnishee of a judgment entered against it pursuant to section (j) of this Rule, the judgment creditor shall file a statement of satisfaction setting forth the amount paid. If the judgment creditor fails to file the statement of satisfaction, the garnishee may proceed under Rule 2-626. (Amended Apr. 7, 1986, effective July 1, 1986; Mar. 22, 1991, effective July 1, 1991; June 7, 1994, effective Oct. 1, 1994; June 5, 1996, effective Jan. 1, 1997; Dec. 10, 1996, effective July 1, 1997; Nov. 12, 2003, effective Jan. 1, 2004; May 8, 2007, effective July 1, 2007; April 21, 2011, effective May 1, 2011.)

**Source.** — This Rule is derived as follows:
*Section (a)* is new but is consistent with former Rules G47 a and G50 a.
*Section (b)* is new.
*Section (c)* is new.
*Section (d)* is in part derived from former Rules F6 c and 104 a (4) and in part new.
*Section (e)* is in part new and in part derived from former Rule G52 a and b.
*Section (f)* is new.
*Section (g)* is new.
*Section (h)* is derived from former Rule G56.
*Section (i)* is new.
*Section (j)* is new.
*Section (k)* is new.
*Section (l)* is new.

**Effect of amendments.** — The 1986 amendment substituted "service" for "filing" at the end of the first sentence in section (g).

The 1991 amendment, in (h), substituted "may serve" for "may file" in the first sentence, substituted "are served" for "are filed" and "after service of the interrogatories" for "after their service" in the second sentence, inserted the third sentence, and substituted "fails to serve" for "fails to file" near the beginning of the fourth sentence.

The 1994 amendment rewrote (c) (2), added the fifth sentence of (e), rewrote (j), and added (k) and (l).

The first 1996 amendment, in the last sentence of (h), substituted "petition" for "motion" and substituted "Rule 15-206" for "Rule P4."

The second 1996 amendment substituted "each judgment debtor with respect to whom a writ is requested" for "the judgment debtor" in (b) (3); in (c) (2), substituted "each judgment debtor" for "the judgment debtor" and substituted "each debtor" for "the debtor"; added the Committee note in (c) (5); and rewrote (k) and (l).

The 2003 amendment substituted "payable or unmatured" for "payable, unmatured, or contingent" at the end of (a).

The 2007 amendment substituted "pursuant to Rule 2-401 (d)" for "pursuant to Rule 2-401 (c)" in (h).

The 2011 amendment added the "Subject to" clause at the beginning of (a).

**University of Baltimore Law Review.** — For article, "The Maryland Rules — A Time for Overhaul," see 9 U. Balt. L. Rev. 1 (1979).

For note discussing whether a garnishee who enters into a bona fide prearmishment contract with a debtor has possession of debtor's property and is liable for fees received by debtor, see 16 U. Balt. L. Rev. 389 (1987).

**Purpose.** — A writ of garnishment is a means of enforcing a judgment; it allows a judgment creditor to recover property owned by the debtor but held by a third party. Parkville Fed. Savs. Bank v. Maryland Nat'l Bank, 343 Md. 412, 681 A.2d 521 (1996).

**Writ must contain name of judgment debtor.** — This Rule specifically requires that the writ contain the name of the judgment debtor; it is not sufficient that the writ contains a veiled reference to another document that supplies this information to the garnishee. Maryland Nat'l Bank v. Parkville Fed. Sav. Bank, 105 Md. App. 611, 660 A.2d 1043 (1995).

569